Roy "Pat" MARCOUX et al., Plaintiffs,

v.

MID–STATES LIVESTOCK, INC., an Iowa Corporation, et al., Defendants.

Civ. Nos. 73–C–2054–C, 73–C–2055–C, C74–3013, C74–3016 and C74–3017.

United States District Court,
N. D. Iowa, C. D.

Jan. 21, 1977.

David A. Domina of Jewell, Otte, Gatz & Collins, Norfolk, Neb., Shook, Hardy & Bacon, William K. Waugh, Jr., Kansas City, Mo., Wayne M. Stallard, Onaga, Kan., and G. A. Cady, Raymond P. Drew, Hobson, Cady & Drew, Hampton, Iowa, John T. O'Brien, O'Brien, Galvin & O'Brien, Souix City, Iowa, for plaintiffs.

Donald C. Wilson and Jack A. Hall, Lundy, Butler, Wilson & Hall, Eldora, Iowa, Thomas Flynn, Des Moines, Iowa, for defendant Gordon Reisinger.

Stewart H. M. Lund, Patrick B. Chambers, Webster City, Iowa, for defendant A. J. Jensen.

John P. Whitesell, James P. Walters, Whitesell Law Firm, Iowa Falls, Iowa, for defendant Roger Jensen, Individually, and as President, Secretary to the Board of Directors, and Director of First National Bank of Eldora, Eldora, Iowa.

J. G. Fletcher, Gamble, Riepe, Burt, Webster & Fletcher, Des Moines, Iowa, for defendants Harold E. Marsh, Jerry L. Higgason, Doris Ruppolt, Judy McCarville and Joanne Smith.

Rex J. Ryden, Cartwright, Druker & Ryden, John F. Veldey, Marshalltown, Iowa, for defendants First National Bank of Eldora and Federal Deposit Ins. Corp.

William N. Dunn, Eldora, Iowa, for defendants W. G. Tietz, A. E. Luiken, C. O. Rubow and Claus Janssen.

John H. Neiman, Neiman, Neiman, Stone & Spellman, Eugene Davis, Ronald L. Hersbergen, Des Moines, Iowa, for defendants Dale Van Wyk and Mid-States Livestock, Inc.

John Anderson, Jr., Anderson, Granger & Nagels, Overland Park, Kan., and John H. Mitchell, Mitchell, Mitchell, Murray & Goode, Fort Dodge, Iowa, for defendants Wagner-Huffman & Burlington Livestock Company, Inc., and Jim Hogan.

## ORDER ON POST–TRIAL MOTIONS

HANSON, District Judge.

### I. INTRODUCTION

The Court herein addresses itself to matters pertaining to a number of diversity cases, cases which were consolidated at trial for the purpose of ascertaining by whom and to what extent certain plaintiffs were damaged in a series of related transactions. Each of the above-named cattle dealers had drawn sight drafts on defendant Mid-States Livestock, Inc., through defendant First National Bank of Eldora, Iowa, for the purchase price of cattle delivered to Mid-States. In late September, 1973, Mid-States became insolvent; and plaintiffs, who had not been paid for their cattle, subsequently commenced five separate actions in this Court. Against the First National Bank and its directors, the plaintiffs alleged negligence for failure to return the unpaid drafts within the requisite midnight deadline. The remaining defendants were sued for fraud. Plaintiffs claimed defendants Mid-States, Dale Van Wyk, an officer and director of that corporation, and Roger Jensen, president of the First National Bank, were liable for the unpaid drafts because they fraudulently misrepresented or concealed Mid-States' financial condition, thereby inducing plaintiffs to deliver their cattle to Mid-States.

The cases were argued before a jury, and the Court submitted five special verdict forms to the jury under Rule 49(a) of the Federal Rules of Civil Procedure. In their October 7, 1976 return of those verdicts, the jury found: (1) that the First National Bank was negligent in its handling of each and every one of plaintiffs' drafts, and (2) that Mid-States, Dale Van Wyk and Roger Jensen were guilty of fraud. The jury, pursuant to the Court's instructions, further set the amount of actual and punitive damages that were to be awarded to the plaintiffs. Following the trial, on November 30, 1976, judgments were entered in favor of the plaintiffs based upon the jury's answers to the special verdicts.

These cases are now before the Court by way of pending post-trial motions. Specifically, these motions are: (1) motion of defendants First National Bank of Eldora and Federal Deposit Insurance Corporation for judgment notwithstanding the verdict and motion for new trial (the insolvent First National Bank has been represented throughout these proceedings by the Federal Deposit Insurance Corporation, as liquidator and receiver); (2) defendant Roger Jensen's motion for judgment notwithstanding the verdict and motion for new trial; (3) defendant Dale Van Wyk's motion for judgment notwithstanding the verdict and motion for new trial; and (4) plaintiffs' motion for new trial as to the directors of the First National Bank of Eldora (the Court directed verdicts for the defendant directors at the close of plaintiffs' evidence).

A hearing on these post-trial motions was held November 23, 1976. In conformity with the Court's predilection, oral argument was directed primarily to the question of whether the First National Bank, even if negligent in its handling of plaintiffs' drafts, had in any way contributed to plaintiffs' damages. Indeed, as the focus of this ruling will further indicate, final determination of these post-trial motions has been deferred because of a lingering concern

that the jury's finding of First National's liability might be unwarranted.

Subsequent to the November hearing, in light of counsel's comments, the record and jury verdicts in these cases were again examined. The Court, upon completion of that examination, has concluded that the jury's findings were within its province as trier of fact. Accordingly, for the reasons herein detailed, the jury verdicts will be permitted to stand.

## II. POST-TRIAL MOTIONS OF DEFENDANTS FIRST NATIONAL BANK OF ELDORA AND FEDERAL DEPOSIT INSURANCE CORPORATION

■ As in the cases in question, a motion for a new trial may be joined with an alternative motion for judgment notwithstanding the verdict. *See* Fed.R.Civ.P. 50(b). Nevertheless, though a party is permitted to join these alternative post-trial motions, they perform wholly distinct functions and are governed by different standards. *Montgomery Ward and Co. v. Duncan*, 311 U.S. 243, 250, 61 S.Ct. 189, 85 L.Ed. 147 (1940). The Court chooses to delineate those standards with some precision. In a case concededly as close as plaintiffs' action against defendants First National Bank and the Federal Deposit Insurance Corporation (FDIC), presumptions within such standards often prove determinative.

### A. MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT

■ Defendants First National Bank and FDIC contend that there was no evidence in the record to create a fact issue either as to First National's alleged negli-

gence or as to the causation of plaintiffs' damage by that negligence. Sufficiency of evidence being a question of law, defendants' pending motion properly requests the Court to set aside the jury's verdict. *See Hover v. MacDonald Engineering Co.*, 183 F.Supp. 427 (S.D.Iowa 1960), affirmed 290 F.2d 301 (8th Cir. 1961).[1] To rule on this motion, the Court has to determine whether the jury's verdict was based upon "substantial evidence." *Duncan v. St. Louis-San Francisco Ry. Co.*, 480 F.2d 79, 83 (8th Cir. 1973); Iowa R.Civ.P. 344(f)(1); *Volkswagen of Iowa City, Inc. v. Scott's Inc.*, 165 N.W.2d 789, 793 (Iowa 1969).[2]

■ The "substantial evidence" test requires that the jury verdict be supported by more than a "scintilla" of evidence. *See Small Co. v. Lamborn & Co.*, 267 U.S. 248, 254, 45 S.Ct. 300, 69 L.Ed. 597 (1924); *Petersen v. Farmers Casualty Co.*, 226 N.W.2d 226 (Iowa 1975). In making that determination, the trial court must examine the record, reviewing the testimony but without assigning credibility or weight to the witnesses and evidence. *Simpson v. Skelly Oil Co.*, 371 F.2d 563, 567 (8th Cir. 1967); *Thieman v. Johnson*, 257 F.2d 129, 132 (8th Cir. 1958). A trial court cannot substitute its judgment of the facts for that of the jury, and must indeed view the evidence in the light most favorable to the party securing the jury verdict. *Tennant v. Peoria and P. U. Ry. Co.*, 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1944); *Bryant v. Rankin*, 332 F.Supp. 319, 321 (S.D.Iowa 1971). Hence, motions for judgments notwithstanding the verdict are sparingly granted, and then ". . . only where the evidence points *all one way* and is susceptible of *no* reasonable inferences sustaining the position of the

1. The standards for granting or denying a motion for judgment notwithstanding the verdict are the same as those governing a motion for a directed verdict. Hence, in its ensuing discussion of defendants' motion for judgment notwithstanding the verdict, the Court, as here, may intermittently cite cases involving directed verdicts in support of its discussion. *See* 5A Moore, Federal Practice, ¶ 50.07[2], 2355 (2d ed. 1974); *Schneider v. Chrysler Motors Corp.*, 401 F.2d 549, 554 (8th Cir. 1968).

2. Historically, in cases premised upon diversity jurisdiction, federal courts have encountered some difficulty in determining whether state or federal standards should be applied to test the sufficiency of the evidence that purportedly supports a jury verdict. *See, e. g., Harwell v. Westchester Fire Ins. Co.*, 508 F.2d 1245 (8th Cir. 1968). In the instant case, this conflict as to the choice of law is of no significance, since "substantial evidence" is the standard utilized by both Iowa and federal courts.

nonmoving party." *Giordano v. Lee*, 434 F.2d 1227, 1231 (9th Cir. 1970), cert. denied, 403 U.S. 931, 91 S.Ct. 2250, 29 L.Ed.2d 709 (1971); *see generally, Seven Provinces Ins. Co., Ltd. v. Commerce and Industry Ins. Co.*, 65 F.R.D. 674 (W.D.Missouri 1975).

With these stringent guidelines as its measure, the Court must review the evidence underlying the jury's finding on the two specific issues challenged by defendants First National Bank and FDIC. The first of these issues, as set forth in defendants' motion for judgment notwithstanding the verdict, is "whether First National Bank of Eldora properly and seasonably handled each of the drafts of the Plaintiffs sent to it for collection from Mid-States Livestock, Inc." Assuming that First National is found to have improperly handled these drafts, the issue then becomes whether the "wrongful conduct of First National Bank of Eldora in the handling of each of Plaintiffs' drafts sent to it for collection from Mid-States Livestock, Inc., was the proximate cause of Plaintiffs' losses or damages."

### 1. *Negligence*

With respect to the issue of improper handling of the drafts, or negligence, defendants FDIC and First National Bank, a "collecting bank" in the circumstances now examined, argued at trial that two of the sight drafts—the draft of plaintiff Thompson, dated September 22, 1973, in the amount of $51,248.80, and the draft of plaintiff Emmett Livestock, dated September 29, 1973 in the amount of $23,430.02— were clearly returned upon nonpayment

within the "midnight deadline" as required by law.[3]

(1) A collecting bank must use ordinary care in . . .

(b) sending notice of dishonor or nonpayment or returning an item . . . to the bank's transferor . . . after learning that the item has not been paid or accepted . . .

(2) A collection bank taking proper action before its midnight deadline following receipt of an item, notice or payment acts seasonably; taking proper action within a reasonably longer time may be seasonable but the bank has the burden of so establishing. § 554.4202(1)(2), Iowa Code (1975).

Although the remaining ten drafts were not acted upon within the midnight deadline, defendants argued these drafts were handled "seasonably" within the meaning of the foregoing section.[4] That is, at trial the banking defendants maintained First National, as a collecting bank, handled said drafts either according to a "course of dealing" established between Mid-States and plaintiffs or else consistent with the custom of collecting banks involved in the cattle industry.

The Court is and has been in full agreement with defendants' view of the law. Case law clearly establishes that seasonableness, as it related to this holding of plaintiffs' sight drafts, could have been established (1) by demonstrating a "course of dealing" between Mid-States and plaintiffs acquiesced in by First National or (2) by "custom and usage" as it related to collecting banks and the utilization of sight

---

**3.** § 554.4105(d), Iowa Code (1975), provides:

" 'Collecting bank' means any bank handling the item for collection except the payor bank." .

§ 554.4104(1)(h), Iowa Code (1975), provides:

" 'Midnight deadline' with respect to a bank is midnight on its next banking day following the banking day on which it receives the relevant item or notice of from which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later."

Iowa adopted most of the "1962 Official Text" of the Uniform Commercial Code in 1965 (ef-

fective July 1, 1966). In 1974, the Iowa legislature adopted almost the entire "1972 Official Text" of the Code, most of which became effective on January 1, 1975. Since the changes made do not affect the sections involved in this ruling, the provisions of the 1975 Code will be cited.

**4.** § 554.1204(3), Iowa Code (1975), provides:

"An action is taken 'seasonably' when it is taken at or within the time agreed or if no time is agreed at or within a reasonable time."

drafts in the cattle industry.[5] *Adams v. Bank of Hydro*, 239 F.Supp. 987 (W.D.Oklahoma 1965); *Willhelm Foods v. National Bank of North America*, 388 F.Supp. 1376 (S.D.N.Y.1974); *Safety Motors v. Elk Horn Bank and Trust Co.*, 18 F.Supp. 872 (W.D. Ark.1954). The Court further agrees, as defendants suggested, that a complete and knowing acquiescence by plaintiffs in the collecting bank's holding of drafts incapable of collection might also negate a finding of negligence. *See Wilheim, supra; Safety Motors, supra.* Defendants were permitted to introduce evidence in support of these theories, and the jury was instructed accordingly.[6]

In reviewing the sufficiency of the evidence underlying the jury's findings, the Court first considers those ten sight drafts admittedly not returned within the midnight deadline. Here the jury's determination that defendants First National Bank and FDIC had failed to excuse the late return by showing the requisite seasonableness through a course of dealing, custom and usage, or acquiescence was supported by more than a "scintilla" of evidence. Plaintiffs' testimony revealed that their prior dealings with Mid-States, if any, amounted to isolated instances rather than a course of dealing which established certain expectations or a common basis of understanding between parties. Substantial evidence also ran contrary to a custom and usage argument. Mr. Carpenter and Mr. Dixon, the forwarding bankers for plaintiffs Emmett Livestock and B & J Cattle, respectively, and Mr. Garatoni, a local Fort Dodge, Iowa banker, all offered uncontroverted testimony to the effect that it was not the custom of their banks or banks with which they were familiar, when acting as collecting banks, to hold comparable sight drafts beyond the midnight deadline. Mr. Higgason, cashier for defendant First National, also questioned the existence of any customary procedure for handling sight drafts in cattle transactions. Nor, finally, can the apparent negligence of First National be excused by plaintiffs' knowing acquiescence. When telephoned by plaintiffs' bankers, First National's agents offered vague assurances of Mid-States financial ability to pay the uncollected drafts. All plaintiffs, when made fully aware of Mid-States' concealed inability to pay the drafts, immediately took action to reclaim their cattle.

The Court, therefore, finds the necessary "substantial evidence" from which the jury could conclude that defendants First National Bank and FDIC failed to carry the burden of proving that First National had taken seasonable action on those sight drafts returned after the midnight deadline. Parenthetically, the Court further notes that defendants neither fully developed the "seasonable" argument at trial nor vigorously pursue it in the pending motion for judgment notwithstanding the verdict. Excepting those drafts purportedly returned within the midnight deadline, which are to be presently considered, defendants appear to rest their nonliability argument

5. § 554.1205, Iowa Code (1975), provides in part:

"(1) A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

"(2) A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. . . . ."

6. Instruction 14 reads in part:

"4. Whenever a party was required to take action with respect to plaintiffs' drafts within a 'reasonable time,' you are instructed that what is meant by that term depends on the nature, purpose and circumstances of such action. What constitutes a 'reasonable time' may also have been fixed by agreement of the parties, a prior course of dealing between the parties, or custom and usage in the banking industry."

Instruction 17 reads in part:

"In the event Mid-States failed to pay a draft, the Bank then had the duty to use ordinary care in returning the unpaid item to its forwarding bank either (1) before the Bank's midnight deadline following receipt of each of the drafts; or (2) within such other period of time as was reasonable in light of all the facts and circumstances."

upon their claim that First National's negligence did not result in damages to the plaintiffs.

Defendants First National Bank and FDIC assert that as to the Thompson sight draft and the Emmett Livestock sight draft for $23,430.02, drafts of two of the plaintiffs which the evidence undisputably shows to have been returned within the midnight deadline, the Court should rule recovery unwarranted as a matter of law. The Court finds defendants' argument convincing. Each of said plaintiffs, conceding that the midnight deadline was met, has unsuccessfully attempted to strike variations upon the negligence claim.

The argument offered during trial for recovery on the Thompson draft was that its presentment through the Federal Reserve System made First National a "payor bank." [7] The apparent purpose underlying this argument is to bring the draft within the damage provision for a payor bank under Section 554.4302. But whatever the purpose and whether truly within that section or not, the section, entitled "Payor bank's responsibility for late return of item," is still bottomed upon the bank's improper handling of an item. Such cannot be the situation where the bank, as in the instant case, clearly returned the item within the midnight deadline.

Emmett Livestock attempted to claim recovery for its timely returned draft by building upon First National's earlier negligence. If its first four September, 1973 drafts had been properly handled and returned, plaintiff maintains that its last sale covered by this draft would not have been made to Mid-States. This type of extenuated argument, however, addresses itself to consequential damages. *See Wilhelm, supra.* Such damages are not recoverable. The Final Pretrial Order stipulated that consequential damages would not be sought, and no objection was offered when the case was not submitted to the jury upon this theory of damages. Thus, the jury's finding of negligence in the handling of this draft, as with the Thompson draft, must be set aside.

### 2. *Damage Liability*

Having determined that the jury had sufficient evidence upon which to find negligence in the defendant First National Bank's handling of all drafts, excepting the Thompson draft and the one Emmett Livestock draft, the issue becomes whether plaintiffs suffered damages as a proximate result of that negligence. Prior case law holding that a collecting bank is directly liable for the damages caused by its negligence, has been codified in Section 554.4103(5), Iowa Code (1975):

> The measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount which could not have been realized by the use of ordinary care . . . .[8]

Pursuant to this section, the issue reduces to whether plaintiffs could have succeeded in collecting any portion of their drafts from Mid-States had First National Bank seasonably returned the drafts. That "collectibility" is the key to the defendants' liability to plaintiffs is made clear by Comment 6 to Section 554.4103(5), Iowa Code (1975):

> When it is established that some part or all of the item could not have been *collected* even by the use of ordinary care the recovery is reduced by the amount which would have been in any event *uncollectible.* (Emphasis added.)

This Court, believing different persons might draw varying conclusions from the same facts with regard to whether plaintiffs with proper notice might have been able to collect any portion of their drafts, submitted the entire matter of collectibility, including inferences to be drawn, to the

---

7. § 544.4105(b), Iowa Code (1975), provides:
 " 'Payor bank' means a bank by which an item is payable as drawn or accepted."

8. The section also makes provision for consequential damages, but the Court, pursuant to the pretrial stipulation heretofore noted, will not discuss that provision.

jury.[9] Defendants challenge the basis for and result of that submission. By their pending motion for judgment notwithstanding the verdict, defendants First National and FDIC insist that the record of these cases simply offers no evidence upon which an inference of collectibility could be made. Not without force, defendants' argument, which has given this Court some pause, certainly merits full consideration.

It is the argument of defendants that this Court is compelled, as a matter of law, to rule that plaintiffs could not have collected any portion of their drafts from Mid-States. Defendants' argument is built upon the acceptance of certain basic legal conclusions which are allegedly drawn from the evidence introduced at trial. First among these conclusions is that plaintiffs, who delivered their cattle without taking any secured interest, were no better than unsecured creditors of Mid-States. Second, as of September 20, 1973, Mid-States was "insolvent" under the accepted tests for insolvency. See § 554.1201(23), Iowa Code (1975). Third, the cattle delivered to Mid-States were in turn delivered to bona fide purchasers both before the midnight deadline on any of plaintiffs' drafts had expired and before plaintiffs became fully aware of Mid-States' inability to pay. Finally, and most importantly, Bankers Trust Company possessed a perfected security agreement that entitled it to first priority in all of Mid-States' non-real estate assets.

The Court has no difficulty in accepting defendants' legal conclusions. Plaintiffs have in fact offered no evidence to suggest that they were anything but unsecured creditors of Mid-States. Nor has the September 20 insolvency date, though retrospectively set following Mid-States collapse, been challenged. And a review of the record reveals that each of the ten drafts yet in question did arrive at the First National Bank after plaintiffs' cattle had been received and sold by Mid-States to a second Iowa purchaser.[10] Replevin actions in state court by plaintiffs against that second purchaser, Eugene E. Wright of Woodbury County, Iowa, established that Wright was a "buyer in the ordinary course of business." See § 554.1201(9), Iowa Code (1975). As a "buyer in the ordinary course of business," Wright was protected from any rights of reclamation that plaintiffs may have possessed as against Mid-States. See § 554.2702(3), Iowa Code (1975).[11]

Because plaintiffs were unable to recoup their losses through recovery of the delivered cattle, defendants argue that the priority and coverage of the Bankers Trust perfected security agreement becomes decisive. If plaintiffs had received seasonable notice from the First National Bank, it is contended that their only hope for collecting on the unpaid drafts was by means of payment through a lien against Mid-States' assets. Defendants assert, however, that any such attempt to procure payment would have proven unsuccessful as a matter of law. In making loans to Mid-States in August, 1972, Bankers Trust Company had coincidently obtained and perfected a security interest in all of Mid-States' non-real estate assets, including Mid-States' inventory, livestock, feed, farm products, crops,

---

9. Instruction 19 reads in part:
 "The measure of damages in connection with each draft is the amount of the draft, less the amount which could not have been recovered by the plaintiff in respect to said draft if it had been handled by the Bank pursuant to the requirements set out in Instruction No. 17.
 "If you find from all the evidence in these cases that a draft or drafts from Mid-States were uncollectible at the time plaintiff should have received notice of non-payment as to such draft or drafts then the amount of deduction from any recovery as required by the above rule would be equal to the amount of such draft which you find could not have been collected."

10. Plaintiffs, with the exception of Thompson, were able to recover cattle sold to other purchasers, and the defendants were given credit in the final judgments for the resale of those recovered cattle.

11. Even if plaintiffs would have possessed a perfected security interest in the cattle, Wright, as a "buyer in the ordinary course of business," would take the cattle free of any security interest. See § 554.9307(1), Iowa Code (1975).

contract rights, and accounts receivable.[12] As of September 20, 1973, defendants argue that the unsecured plaintiffs, even with seasonable notice of Mid-States' nonpayment from defendant First National, had no legal means by which to take priority over the Bankers Trust security interest.

Defendants First National and FDIC further note that plaintiffs also could not have attached funds kept by Mid-States in checking accounts at First National Bank and Bankers Trust Company. Had plaintiffs attempted such attachment, First National and Bankers Trust, which had outstanding loans to Mid-States for nearly $300,000.00 and $800,000.00, respectively, would have exercised their right of set-off against the Mid-States accounts. Hence, defendants conclude, on the date of Mid-States' insolvency, the banks had legally cornered and secured from any other creditor all of Mid-States' non-real estate assets.

Again the Court accepts defendants' conclusions concerning the priority of Bankers Trust's security interest and the right of the two banks to set-off Mid-States' loans against its bank accounts. Mr. Pappas, senior vice-president of Bankers Trust Company, and Mr. May, an FDIC official who closed out the insolvent First National Bank, have both testified as to the priority of Bankers Trust's security interest. And the law as to a bank's right to set-off funds deposited against a debt owed by a depositor is clear. *See e. g., Jensen v. State Bank of Allison,* 518 F.2d 1 (8th Cir. 1975). Nevertheless, the Court does not believe that the legal priority which Bankers Trust may have had as to all Mid-States assets is determinative of defendant First National's liability for damages sustained by the plaintiffs. In overruling the defendants' motion for a directed verdict, the Court noted that the issue to be decided was not whether Bankers Trust had first legal claim to all remaining Mid-States assets as of the September 20, 1973 insolvency date; the issue

rather was whether the plaintiffs, had they received seasonable notice of nonpayment from the First National Bank, could have *collected* any portion of their drafts from Mid-States between September 21, 1973, the date of the midnight deadline for the first of the drafts received, and October 4, 1973, the day Mid-States ceased doing business. Citing *Schooler Motor v. Bankers Trust Co.,* 216 Iowa 1148 (1933) for support, the Court submitted the issue of collectibility and damages to the jury.[13] The jury thereafter determined plaintiffs had shown that seasonable notice would have enabled them to collect the full amount owing on their sight drafts. Defendant First National Bank, therefore, was found liable for damages. The only remaining question for this Court, by way of the pending motion for judgment notwithstanding the verdict, is whether there was more than a "scintilla" of evidence from which the jury could find that the sight drafts were collectible.

Plaintiffs have persistently maintained that an insolvent corporation does not cease to do business at the moment of its insolvency. Throughout the trial of these cases, plaintiffs' counsel attempted to demonstrate that despite the Bankers' Trust security agreement and Mid-States' apparent insolvency as of September 20, 1973, Mid-States continued to operate as a going business until October 3, 1973. The testimony elicited from Mr. Pappas and Bill Reese, the accountant for Mid-States, did provide "substantial" evidence from which the jury could reasonably conclude that Mid-States did continue to operate in a capacity that would have enabled properly notified plaintiffs to collect on their drafts.

Pappas' testimony was clear that Bankers Trust remained unaware of Mid-States' financial problems until September 30, 1973, which was from three to nine days after the midnight deadline for all but one of the ten drafts in question. Following this September 30 discovery of Mid-States' financial

---

**12.** Mid-States' real estate had previously been pledged as security for a loan from Central National Bank, Chicago, Illinois. Plaintiffs have never attempted to attach or encumber the real estate, concurring that there was no equity in the property.

**13.** *See, supra,* note 9.

problems, the cattle business ostensibly continued while a series of meetings was held to discuss the feasibility of refinancing the faltering corporation. Mid-States' financial plight was the result not of its buying and selling of cattle but of its disastrous speculation in the beef commodity market, where some $2 million had been lost within but a few months. The meetings were held in hopes that Bankers Trust and Mr. Heinhold, a Van Wyk business associate and Chicago financier involved in the commodity business, might be able to negotiate a plan to cover the commodity losses and save Mid-States and defendant First National Bank. First National, a correspondent bank of Bankers Trust, was at this time facing insolvency because of its entanglement in Mid-States' inability to pay outstanding loans and debts. Not until October 3, 1973, when the meetings had apparently revealed the futility of the situation, were the officers of Mid-States and First National informed that no assistance was forthcoming. Bankers Trust thereafter expended its efforts in recovering the money earlier loaned to Mid-States. As personal guarantor of that loan, Van Wyk worked with Bankers Trust and was eventually able to satisfy all but some $75,000.00 of the debt from Mid-States' assets. Van Wyk personally paid the remaining sum.

Although Mid-States was insolvent as of September 20, 1973, Bill Reese, the Mid-States accountant who made the insolvency determination, testified that this fact was unknown until after he took possession of the corporation's financial records on October 6, 1973. Thus, at least until the time of those refinancing negotiations between September 30 and October 3, 1973, Mid-States continued to buy and sell cattle. Unaware of any problem, Bankers Trust, as it had throughout the preceding year, allowed cattle to move in and out of the security agreement with Mid-States. Indeed, Pappas, who testified that the August financial records indicated Mid-States was having a good business year, conceded that his bank made no objection to Mid-States' handling of its business until after September 30, 1973. Upon further questioning by

plaintiffs' counsel, Pappas also noted that on October 2 Mid-States had $274,808.96 in its Bankers Trust account, an account from which checks were being paid as late as October 1 and October 2, 1973.

Further testimony from Reese, Van Wyk's personal accountant, revealed that Van Wyk, in apparent payment for livestock he purchased from Mid-States, received payments from Mid-States for $6,000.00 and $18,000.00 on September 21 and September 24, 1973, respectively. Testimony during the trial also suggested that Van Wyk, whose own worth was estimated at $1.4 million the previous summer, may have paid other livestock dealers doing business with Mid-States during September of 1973. Although never firmly established, the evidence further suggested that Van Wyk was probably receiving salary and commissions from Mid-States until its September collapse.

From the combined testimony concerning the continuing business efforts of Mid-States and Van Wyk, who was running Mid-States in late September, the jury concluded that plaintiffs, with proper nonpayment notice from defendant First National, would have become concerned and made successful demands for payment from Mid-States. Since the midnight deadlines of all drafts passed prior to October 3, 1973, the demands could have been made while Mid-States was still in operation. Plaintiffs' suggestion that they would have sought to overcome Bankers Trust's legal hold on the assets with purchase money security interests is perhaps questionable, but it is possible that plaintiffs may have collected by merely making oral demands. Bankers Trust, until September 30, had not monitored Mid-States' business. Possibly, between September 20 and September 30, payments could have been procured before the extent of Mid-States' financial problem was recognized. Even if the plaintiffs' demands would have brought the problem to light at an earlier time, Van Wyk, able to leave his profit in the corporation and capable of absorbing personal loss, may then have made the payments through Mid-

States, hoping both to maintain the trust he testified was crucial in the cattle business and to work Mid-States out from under its debts. His friendship with Heinhold seemingly increased the likelihood that Mid-States might earlier have been refinanced and kept afloat. In any case, testimony shows that some of Mid-States' debts were paid as late as October 2, 1973.

There clearly was "substantial" evidence from which the jury could conclude that proper notice would have made the drafts collectible. It is not the Court's function in ruling on a motion for judgment notwithstanding the verdict to substitute its judgment as to collectibility. *See Seven Provinces, supra,* at 682. The question for the Court is whether the testimony showed collectibility of the drafts was possible, and not whether the Court agrees with the jury's verdict. The Court finds that the evidence was sufficient to make collection a possibility.

Defendants First National Bank and FDIC, arguing their entitlement to a motion for judgment notwithstanding the verdict as a matter of law, further assert that a transfer of assets to any of the plaintiffs in satisfaction of Mid-States' debt to said plaintiffs would have constituted a preferential and hence voidable transfer. This claim apparently assumes that Bankers Trust, with the legal priority of its security interest, would have deemed such a transfer an act of bankruptcy and have initiated the filing of an involuntary petition of bankruptcy against Mid-States. *See* 11 U.S.C. § 95. No support is offered to show this would have occurred; the evidence suggests that Bankers Trust might simply have sought recovery of further losses from Van Wyk, as personal guarantor of its loan to Mid-States. Nor is it clear that a transfer of assets to plaintiffs would have constituted a voidable preference. In addition to proving the six elements of a preferential transfer pursuant to 11 U.S.C. § 96(a), it would also have to be established that the plaintiffs as creditors had, at the time when the transfer was made, reasonable cause to believe that the debtor was insolvent. *See*

*Engelkes v. Farmers Co-operative Co.,* 194 F.Supp. 319 (N.D.Iowa 1961). That such a fact question might be resolved against plaintiffs, in view of Reese's testimony that no one knew of Mid-States' insolvency, is far from certain. Nor would Mid-States' inability to make payments upon demand be conclusive that plaintiffs had reasonable cause to believe Mid-States was insolvent. *See Engelkes, supra,* at 329. Furthermore, a payment procured by plaintiffs might have come through Van Wyk and not have been subject to Bankers Trust's security agreement with Mid-States.

The Court, having necessarily reviewed the record in a light most favorable to the jury's verdict, concludes there is no matter of law to undercut and "substantial" evidence to support the findings of the jury. Therefore, defendants' motion for judgment notwithstanding the verdict must be overruled.

### B. MOTION FOR A NEW TRIAL

 Unlike a motion for judgment notwithstanding the verdict, a motion for a new trial is addressed to the sound discretion of the trial court. *Sanden v. Mayo Clinic,* 495 F.2d 221, 226 (8th Cir. 1974). Indeed, in ruling on defendants' alternative motion for a new trial, the Court is not bound by the substantial evidence test, and is permitted to assign weight and credibility to the evidence considered. *Hover, supra,* at 430; *Simpson, supra,* at 570. Nevertheless, despite this broad power vested in the trial court, ". . . there exist some boundaries to the exercise of the trial court's discretion in granting a new trial." *Fireman's Fund Insurance Co. v. Aalco Wrecking Co., Inc.,* 466 F.2d 179, 186 (8th Cir. 1972), *cert. denied,* 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973). The boundaries generally proscribed are that a new trial motion should not be granted unless the moving party has met his burden of showing either that prejudicial error has been committed or substantial justice not achieved. *See Midcontinent Broadcasting Co. v. North Central Airlines, Inc.,* 471 F.2d 357, 359 (8th Cir. 1973).

■ The Court has reviewed the complete record and, having assigned weight and credibility to the evidence introduced, simply cannot conclude that substantial justice was not achieved by the jury verdicts. With the exception of objections to certain instructions and a hypothetical question posed to plaintiffs' experts, defendants First National Bank and FDIC offer the same grounds in support of this motion as their motion for judgment notwithstanding the verdict. Even if the objections had merit, a concession this Court is unwilling to make, they would not rise to that level of substantial and prejudicial error which warrants the granting of a new trial. Hence, finding no clear miscarriage of justice to have occurred, defendants' alternative motion for a new trial will also be overruled.

### III. OTHER PENDING POST–TRIAL MOTIONS

As to all other pending post-trial motions in these cases, which have been heretofore enumerated, the Court finds them to be without substance. Extensive comment on the arguments of the remaining defendants for either judgments notwithstanding the verdicts or new trials is unnecessary. A review of the record unquestionably establishes that there was "substantial" evidence from which the jury could properly determine that defendants Roger Jensen and Dale Van Wyk were guilty of fraud. The Court, too, finds no merit in Van Wyk's objections to the jury instructions; though, as to his objection that the Packers and Stockyards Act was neither within the ambit of the pleadings nor applicable law in this isolated situation of dealer fraud, the Court would note that defendant was stipulated to be a licensed dealer in the Final Pretrial Order and would also call defendant's attention to 9 C.F.R. § 201.41—the basis for the instruction to which defendant takes exception.[14]

No market agency or licensee shall make such use or disposition of funds in its possession or control as will endanger or impair the faithful and prompt accounting for and payment of such portion thereof as may be due the consignor or shipper of livestock . . ..

*See United States v. Donahue Brothers,* 59 F.2d 1019 (8th Cir. 1932); *Bowman v. United States Dept. of Agriculture,* 363 F.2d 81 (5th Cir. 1966); *Daniels v. United States & Benson,* 242 F.2d 39 (7th Cir. 1957).

Finally the basis for directing a verdict in favor of the defendant directors of the First National Bank of Eldora was made explicit on the record at trial. The Court stands on that record and will overrule plaintiffs' motion for a new trial as to those defendants.

Accordingly, for all of the foregoing reasons,

IT IS HEREBY ORDERED that the motion of defendants First National Bank of Eldora and FDIC for judgment notwithstanding the verdict as to plaintiff Thompson and plaintiff Emmett Livestock Commission, to the extent of Emmett's claim for damages on its September 29, 1973 sight draft, is sustained.

IT IS FURTHER ORDERED that the motion of defendants First National Bank of Eldora and FDIC for judgment notwithstanding the verdict as to all other plaintiffs and remaining drafts is overruled.

IT IS FURTHER ORDERED that the alternative motion of defendants First National Bank of Eldora and FDIC for a new trial is overruled.

IT IS FURTHER ORDERED that the motions of defendant Roger Jensen for

14. Instruction 21 reads:

The Packers and Stockyards Act was designed to comprehensively regulate packers, stockyards, marketing agents, and dealers. This legislation, among other purposes, was intended to insure the proper handling of shippers' funds and their proper transmission to the shippers. Pursuant to the Packers and Stockyards Act, a livestock dealer, or one engaged in the business of buying and selling livestock in commerce, stands as a fiduciary in that he is entrusted not to make use of funds in his possession or control so as to endanger the prompt accounting for and payment of such portion thereof as may be due to shippers of livestock.

judgment notwithstanding the verdict or for a new trial are overruled.

IT IS FURTHER ORDERED that the motions of Dale Van Wyk for judgment notwithstanding the verdict or for a new trial are overruled.

IT IS FURTHER ORDERED that the plaintiffs' motion for a new trial as to defendants W. G. Tietz, C. O. Rubow, A. E. Luken, Claus Janssen and the Estate of A. J. Jensen, deceased, as directors of the First National Bank of Eldora, is overruled.