572 F.2d 651
 23 UCC Rep.Serv. 977
 Roy "Pat" MARCOUX, Jim Thompson, Sr., Don M. Burtenshaw and
Ben D. Jernberg, a partnership, d/b/a B & J Cattle Company
of Terreton, Idaho, Roy J. Henkel, Emmett Livestock
Commission Company, Inc., Appellees,
v.
Dale VAN WYK, Appellant.
Roy "Pat" MARCOUX, Jim Thompson, Sr., Don M. Burtenshaw and
Ben D. Jernberg, a partnership, d/b/a B & J Cattle Company
of Terreton, Idaho, Roy J. Henkel, Emmett Livestock
Commission Company, Inc., Appellees,
v.
FIRST NATIONAL BANK OF ELDORA and the Federal Deposit
Insurance Corporation, Appellants.
 Nos. 77-1146 and 77-1271.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 14, 1977.
Decided March 29, 1978.
Rehearing Denied April 18, 1978.
 
 1
 Thomas G. McCuskey (argued), Neiman, Neiman, Stone & Spellman, John H. Neiman, and Thomas M. Zurek, Des Moines, Iowa, on brief, for appellant, Dale Van Wyk.
 
 
 2
 John F. Veldey (argued), Cartwright, Druker & Ryden, Marshalltown, Iowa, on brief, for appellants, First National Bank of Eldora and Federal Deposit Insurance Corp.
 
 
 3
 David A. Domina (argued), Deutsch, Jewell, Otte, Gatz, Collins & Domina, Norfolk, Neb., James H. Ottman, Shook, Hardy & Bacon, Kansas City, Mo., and G. A. Cady, Hobson, Cady & Drew, Hampton, Iowa, on brief, for appellees.
 
 
 4
 Before LAY and ROSS, Circuit Judges, and LARSON,* Senior District judge.
 
 
 5
 LARSON, Senior District Judge.
 
 
 6
 These appeals involve five consolidated diversity cases, arising out of the sale of livestock by appellees, plaintiffs below, to Mid-States Livestock, Inc., an Iowa corporation, in exchange for sight drafts drawn on Mid-States. The drafts were never paid. Plaintiffs sued Mid-States; Dale Van Wyk, its treasurer and a chief stockholder; the First National Bank of Eldora, Iowa (the Bank) and its directors; Roger Jensen, the Bank's president; and the Federal Deposit Insurance Corporation (FDIC), the receiver of the Bank, on various theories of fraud and negligence. The district court directed a verdict for the Bank's directors at the close of plaintiffs' case; the remaining issues were submitted to the jury and a verdict for the plaintiffs was returned. Van Wyk, the Bank and the FDIC moved for judgments notwithstanding the verdict and for new trials, which the trial court denied. Marcoux v. Mid-States Livestock, Inc., 429 F.Supp. 155 (N.D. Iowa 1977). All three parties appeal from those rulings.[1]
 
 
 7
 * The major issue on this appeal is the denial of the Bank's and the FDIC's motions for judgment n. o. v. The facts related to that issue are carefully and thoroughly discussed in the district court's order on the post-trial motions, supra, and will be reviewed only briefly here.
 
 
 8
 Plaintiffs are cattle dealers who delivered cattle to Mid-States at various times during September 1973, accepting sight drafts totalling about $530,000 drawn on Mid-States in return. The drafts were forwarded by plaintiffs' bankers to the First National Bank of Eldora for collection. The Bank held the drafts unpaid, on Mid-States' instructions, beyond its midnight deadline. See Iowa Code § 554.4104(1)(h) (1975). All of the drafts relevant here were received by the Bank between September 20 and September 28, but none were returned to plaintiffs' banks until October 3. On that same date, Mid-States collapsed; it had been speculating heavily since August in the commodities market and had diverted large amounts of its working capital to cover margin calls. By September 20, 1973, it was insolvent and subsequent attempts to save the company failed. A day after Mid-States collapsed, the First National Bank was declared insolvent because it had made numerous unsecured extensions of credit to Mid-States. The FDIC was appointed liquidator and receiver.
 
 
 9
 The theory of recovery against the Bank was that it acted negligently in holding the unpaid drafts well beyond its midnight deadline. See Iowa Code § 554.4202(1)(2) (1975). When a bank handles an item carelessly, it is liable for the damages caused by its negligence in the amount of the item reduced by the amount that could not have been collected in any event. Iowa Code § 554.4103(5). In other words, the plaintiffs' measure of damages is the amount they could have collected had the Bank returned the unpaid drafts seasonably; conversely, if the amounts due were uncollectible in any event, the Bank's negligence caused no damage. Appellants argue that the jury verdict awarding plaintiffs the full amount of their drafts must be set aside both because the evidence does not support a finding of negligence and because plaintiffs failed to show that any portion of the drafts was collectible.
 
 
 10
 On a motion for judgment n. o. v., the court must give the party securing the jury verdict the benefit of all reasonable inferences to be drawn from the evidence. Griggs v. Firestone Tire & Rubber Co., 513 F.2d 851, 857 (8th Cir. 1975). A party is not entitled, however, to the benefit of unreasonable inferences or those "at war with the undisputed facts." Schneider v. Chrysler Motors Corp., 401 F.2d 549, 555 (8th Cir. 1968). Moreover, the verdict must be supported by substantial evidence; a mere scintilla is not enough. Simpson v. Skelly Oil Co., 371 F.2d 563, 568 (8th Cir. 1967). An appellate court follows the same standards as the trial court in testing the propriety of a judgment n. o. v. Schneider v. Chrysler Motors Corp., supra.
 
 
 11
 After a careful review of the record in this case, we agree with the district court on the issue of negligence for the reasons stated in the court's memorandum on post-trial motions. 429 F.Supp. at 159-69. There was sufficient evidence from which the jury could infer that the Bank failed to use ordinary care in handling the drafts.
 
 
 12
 But the interrelated issues of causation and damages concededly present a much more difficult problem. Appellants draw a number of conclusions from the record which indicate that the amounts due were as a matter of law uncollectible. The trial court agreed with most of these conclusions, as do we, and we will recite them only briefly here before discussing the grounds upon which the trial court denied the judgments n. o. v.
 
 
 13
 The undisputed facts drawn from the record reveal that Mid-States was insolvent from and after September 20, 1973. Plaintiffs were unsecured creditors of Mid-States. They delivered unqualified control of their cattle to Mid-States, solely in reliance on Mid-States' credit, on the dates the drafts were drawn. The cattle were sold to a buyer in the ordinary course of business before the drafts arrived at the Bank. Even with timely notice of nonpayment, plaintiffs could not have recovered by stopping delivery of the cattle or replevying them. See 429 F.Supp. at 162.
 
 
 14
 Plaintiffs as unsecured creditors would therefore have had to try to collect the amount of their drafts through liens on other Mid-States assets. All of these assets were subject to prior valid liens. Mid-States' real estate was pledged to Central National Bank; its non-real assets were subject to a security interest of the Bankers Trust Company; its checking accounts were subject to the rights of set-off of the First National Bank of Eldora and Bankers Trust. 429 F.Supp. at 162-63. Since even after liquidation, Bankers Trust's claims remained unsatisfied, it is clear that as a matter of law, plaintiffs could not have collected the amounts due by asserting junior liens on Mid-States' assets.[2]
 
 
 15
 Although no legal actions could have secured payment of the money due, plaintiffs nevertheless argue that other evidence supports an inference of collectibility. The trial court accepted this position, which is essentially based on the fact that Mid-States continued doing business from September 20, by hindsight established as the date of its insolvency, until October 3. Bankers Trust, which held the security interest on Mid-States' non-real assets, did not become aware of the company's financial difficulties until September 30, at which time it began monitoring the business. Thus, the trial court found there was a possibility that plaintiffs may have collected by making oral demands on Mid-States between September 20 and September 30, before the company's financial problems were fully realized. The court also noted there was a possibility that Mid-States' principal shareholder, Van Wyk, would have paid the debts personally. The court concluded that this was substantial evidence from which the jury could have decided that "collection was a possibility." 429 F.Supp. at 165.
 
 
 16
 We agree that there was some evidence from which the jury could have concluded that collection was a possibility; the difficulty is that that possibility was exceedingly remote. Review of a jury verdict on this issue is admittedly complicated by the nature of the inquiry the jury must engage in, for they are asked to answer a hypothetical question what amount could plaintiffs have collected had they received timely notice, which they did not in fact receive? But the legal standard governing causation and damages under UCC 4-103(5), or the same provision in the Iowa Code, while it permits reasoned deductions from probative facts, does not permit mere guesswork. Plaintiffs must show they would have had at least a reasonable chance to collect. See Schooler Motor Co. v. Bankers Trust Co., 216 Iowa 1147, 247 N.W. 628, 630 (1933) (plaintiff must show he "could probably have recovered the amount due . . . .") (emphasis added). It is not enough to show that by a fortuitous combination of unlikely events there was a dim hope of collection. At best, that is all that the record discloses here.
 
 
 17
 It is true that Van Wyk personally paid many of the debts of Mid-States. He did not pay these plaintiffs. But there is nothing in the record to suggest that had the Bank returned the drafts on time Van Wyk would have paid. First, he only paid persons with whom he had dealt and he had never dealt with these plaintiffs. More important, there is no evidence that Van Wyk paid any of Mid-States' obligations before the collapse of the company. Had he done so, plaintiffs might have had a reasonable argument that the Bank's negligence prevented them from demanding payment at a crucial time when the likelihood of success was greatest. But as it was, the Bank's negligence had no effect on plaintiffs' chances to collect from Van Wyk; nothing shows he would have been reasonably likely to pay before October 3, if asked; nothing prevented him from paying after October 3; nothing prevents him from paying voluntarily even now. The only reasonable inference that can be drawn from the record is that the amounts due were uncollectible from Van Wyk in any event.
 
 
 18
 The second possibility upon which the jury verdict might have been based was the chance that between September 20 and September 30 plaintiffs could have received payment from Mid-States by making an oral demand.[3] Bankers Trust was not monitoring the company's accounts at the time and may have permitted the money to be used without objection. Debts were paid from the Mid-States account as late as October 2, 1973. But this possibility is based on what may only be regarded as speculative assumptions. The first assumption is that plaintiffs, upon receipt of the unpaid drafts would have surmised that Mid-States was in financial difficulty and taken immediate steps, collectively, to demand payment. It is significant in this regard that two of the plaintiffs knew, through telephone conversations, that the drafts were sitting at the Bank unpaid, but took no steps then to secure payment. They may, however, have been misled by bank officials' value assurances that payment would be forthcoming, so this first assumption is not entirely unreasonable. But the second assumption is that Mid-States, which had refused to pay the sight drafts, would have turned around and acceded to oral demands. The only reason or motivation even vaguely suggested for such an improbable occurrence was an interest in maintaining goodwill; but it nearly defies common sense to assume if the company was unwilling to pay the sight drafts to maintain goodwill, it would nevertheless have paid on oral demand. Moreover, it was not able to pay every creditor; although there was a large flow of cash through the Mid-States checking accounts in the latter part of September, not every obligation could have been met. Even as it was, checks totalling some $230,000 were returned unpaid; to satisfy plaintiffs, Mid-States would have had to divert its working capital to them to the prejudice of other creditors with an equal claim to payment. The third assumption is that even if Mid-States had paid a draft out of its remaining funds, Bankers Trust would have remained ignorant of the company's financial crisis and would not have begun monitoring the accounts any earlier than it did. Finally, the record shows that Bankers Trust took every reasonable step to collect on its security interest after the company collapsed; but to support the verdict, it has to be assumed that Bankers Trust would not have sought to recover from the plaintiffs by tracing the proceeds from Mid-States' secured accounts into plaintiffs' hands.
 
 
 19
 Each of these assumptions is based largely on surmise; taken together, they add up to nothing more than the most remote possibility that plaintiffs could have collected the amounts due on the unpaid drafts. We do not believe that a jury verdict based on such improbable conjecture can be permitted to stand. The standard under the Code is not a particularly liberal one in terms of plaintiff recovery; it is set up to protect banks from liability for customers' debts unless there is a clear causal connection between the bank's actions and the plaintiff's loss. On this record there is simply insufficient evidence to show that the plaintiffs would have had a reasonable chance to collect if the midnight deadline had been met; the cause of plaintiffs' losses was Mid-States' problems, not the actions of the bank. We hold that the trial court should have granted judgments notwithstanding the verdict to the Bank and the FDIC.
 
 
 20
 Further, we hold that there was no abuse of discretion in denying the motions for new trials.
 
 II
 
 21
 Appellant Van Wyk also contested the trial court's failure to grant a judgment n. o. v. or a new trial. He alleges that there was insufficient evidence upon which the jury could have based a finding of fraud and that several of the jury instructions were in error. On review of the entire record, we find that the jury verdict was based on substantial evidence, and that there was no prejudicial error in the jury instructions. The district court properly denied the motions for judgment n. o. v. and for a new trial.
 
 
 22
 The order of the district court denying the motions of the First National Bank of Eldora and the FDIC for judgments notwithstanding the verdict is reversed and the case is remanded for further proceedings not inconsistent with this opinion. The order of the district court denying the motions of the First National Bank of Eldora and the FDIC for new trials is affirmed. The district court's order denying Van Wyk's motions for a new trial and judgment n. o. v. is affirmed.
 
 
 
 *
 The Honorable Earl R. Larson, United States Senior District Court Judge for the District of Minnesota, sitting by designation
 
 
 [1]
 No appeal was taken from the lower court's disposition of other post-trial motions by Roger Jensen and plaintiffs
 
 
 [2]
 Plaintiffs have argued that they could have asserted valid purchase money security interests on Mid-States' assets. But the record is devoid of evidence that a security agreement was entered into at the time of sale; it shows affirmatively that plaintiffs delivered their cattle without qualification to Mid-States on the dates the drafts were drawn
 
 
 [3]
 The relevant time period would actually have been from September 24 or 25 to September 30; the midnight deadline for the first of the drafts was September 21, and expert testimony at trial showed that approximately three days is allowed for mailing time. September 24 thus appears to be the earliest time any of the plaintiffs could have received the drafts back