NORTHWEST BANK & TRUST
COMPANY, Appellant,

v.

FIRST WESTSIDE BANK, Appellee.

NORTHWEST BANK & TRUST
COMPANY, Appellee,

v.

FIRST WESTSIDE BANK, Appellant.

Nos. 90–2951, 90–2952.

United States Court of Appeals,
Eighth Circuit.

Submitted May 17, 1991.

Decided Aug. 15, 1991.

Joe B. Slavens, Davenport, Iowa, for appellant.

William E. Morrow, Jr., Omaha, Neb., for appellee.

Before LAY, Chief Judge, HEANEY, Senior Circuit Judge, and DOTY,* District Judge.

---

* The HONORABLE DAVID S. DOTY, United States District Judge for the District of Minnesota, sitting by designation.

LAY, Chief Judge.

Parkfair Pisa, Inc. ("Parkfair") maintained a checking account at First Westside Bank of Omaha ("Westside"). From November 28 through December 3, 1986, Parkfair drew five checks totalling $46,739.00 on Westside, the "paying bank."[1] The checks were payable to Pisa Pizza ("Pisa") and were deposited in Pisa's checking account at the "depository bank," Northwest Bank and Trust Company ("Northwest"), an Iowa banking corporation located in Davenport, Iowa. Northwest sent the checks through the Federal Reserve System for collection. When the Federal Reserve Bank of Kansas City, Omaha branch, presented the checks to Westside, Westside refused to honor the Parkfair checks because they were drawn on uncollected funds.[2] Westside, however, failed to give Northwest notice of its refusal to pay the checks as required under Federal Reserve Board Regulation J.[3] After the Parkfair checks totalling $46,739.00 were returned by Westside, the Pisa account was overdrawn in the amount of $43,128.43. Northwest asserts that it would have dishonored $44,421.00 in checks drawn on Pisa's account and presented for payment by Northwest Bank of Kearney, Nebraska (the "Kearney Bank") on December 5, 1986, if it had received timely notice of dishonor from Westside.

On December 4, 1986, when the balance in the Pisa account at Northwest was $88,068.58 of which $86,555.00 represented uncollected funds, the Kearney Bank notified Northwest that an $11,133.00 check drawn on the Kearney Bank by MIMCO, a Kearney Bank customer, and deposited in the Pisa account was being returned. Northwest then placed a hold on the Pisa account *in that amount.* On December 5, 1986, however, Northwest paid by cashier's check five different checks totalling $44,421.00, which had been drawn on the Pisa account, to the Kearney Bank after representatives of the Kearney Bank presented the checks for payment in person.[4]

Northwest paid the five checks to the Kearney Bank the day after the Regulation J notification deadline passed for Parkfair check number 1685 in the amount of $10,286.00. Regulation J did not require Westside to notify Northwest of its refusal to pay the other four Parkfair checks until after Northwest paid the five checks presented by the Kearney Bank.[5]

Between December 9 and December 15, 1986, the Kearney Bank returned unpaid to Northwest five additional checks drawn on the MIMCO account totalling $39,816.00, which had been deposited in the Pisa account at Northwest prior to December 5, 1986. Northwest received timely notice from the Kearney Bank of the return of four of these checks after December 5, 1986. Westside and the Kearney Bank's failure to collect funds from Parkfair and MIMCO, respectively, combined with Northwest's payment of the cashier's check

1. Check number 1685 ($10,286.00); check number 1688 ($8,935.00); check number 1690 ($8,897.00); check number 1691 ($8,899.00); and check number 1695 ($9,722.00). These checks totalled $46,739.00.

2. Uncollected funds are funds on deposit which have not been finally paid by the paying bank and therefore are subject to dishonor and return.

3. Regulation J provides in pertinent part:

   (c) **Notification of Nonpayment.** **(1)** A paying bank that receives a cash item in the amount of $2500 or more directly or indirectly from a Reserve Bank and determines not to pay it shall provide notice to the first bank to which the item was transferred for collection ("depository bank") that the paying bank is returning the item unpaid. . . .

   (2) The paying bank shall provide the notice such that it is received . . . by the depository bank by midnight of the second banking day of the paying bank following the deadline for return of the item as specified in paragraph (a) of this section.

   12 C.F.R. § 210.12(c)(1), (2) (1986).

4. Northwest previously had returned the checks unpaid to the Kearney Bank because they were not endorsed properly. The Kearney Bank later flew representatives to Davenport to obtain, by cashier's check, the $44,421.00 from Northwest.

5. The Regulation J deadline for check number 1688 was December 8, 1986; the Regulation J deadline for check numbers 1690 and 1691 was December 9, 1986; and the Regulation J deadline for check number 1695 was December 10, 1986.

for $44,421.00, caused the Pisa account to be overdrawn by $43,128.43.

Northwest brought an action against Westside to recover damages allegedly incurred due to Westside's failure to comply with the notice requirements of Regulation J. The district court found that Westside failed to exercise ordinary care by not notifying Northwest of its refusal to honor the five Parkfair checks within the time specified in Regulation J.[6] The court held, however, that Northwest still would have lost $32,842.43 even if Westside had followed Regulation J. The court reasoned that as of the time Northwest paid the checks presented by the Kearney Bank, Westside had violated Regulation J only with regard to Parkfair check number 1685 in the amount of $10,286.00. Consequently, the court awarded Northwest $10,286.00 in damages.

Northwest now appeals the district court's judgment limiting its recovery of damages against Westside to $10,286.00. Westside cross appeals on the ground that the district court should not have awarded Northwest any damages under its findings of fact. We affirm.

Proximate Cause

■ Northwest argues the district court erred by finding that it still would have incurred a loss of $32,842.43 even if Westside had exercised ordinary care in meeting the requirements of Regulation J. Northwest contends that it would not have paid the five checks drawn on the Pisa account and presented by the Kearney Bank and consequently would not have suffered any loss if Westside had notified Northwest properly of its refusal to pay the Parkfair checks. Two employees of Northwest, Michele Rothweiler and Ruth Willits, testified that Northwest would have frozen the entire balance of the Pisa account to research its composition and would have refused to honor any checks presented by the Kearney Bank if Westside had notified Northwest of its decision to dishonor check number 1685 on December 4, 1986, the same day the Kearney Bank dishonored a check in the amount of $11,133.00. According to Willits, it would be "extremely unusual" for Northwest to receive two large item return notices from two different financial institutions on the same day for the same account. Tr. at 130.

■ Regulation J provides in pertinent part:

A paying bank that fails to exercise ordinary care in meeting the [notification] requirements ... shall be liable to the depository bank for losses incurred by the depository bank, up to the amount of the item, reduced by the amount of the loss that the depository bank would have incurred even if the paying bank had used ordinary care.

12 C.F.R. § 210.12(c)(6) (1986). Under Regulation J, a paying bank is not liable to a depository bank for failing to exercise ordinary care in handling an item unless the depository bank's losses were proximately caused by the paying bank's negligent actions. Cf. Appliance Buyers Credit Corp. v. Prospect Nat'l Bank of Peoria, 708 F.2d 290 (7th Cir.1983); Marcoux v. Van Wyk, 572 F.2d 651 (8th Cir.1978), cert. denied, 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1979); Northpark Nat'l Bank v. Bankers Trust Co., 572 F.Supp. 524 (S.D.N.Y.1983).

■ The district court found that Westside's failure to exercise ordinary care in notifying Northwest of its refusal to pay the Parkfair checks only caused Northwest to incur a loss of $10,286.00. The district court rejected Northwest's argument that the entire loss would have been abated had Westside given timely notice of dishonor for check number 1685. The issue is proximate cause. The district court is in a much better position to determine the proximate cause of Northwest's loss than this court. Because proximate cause is a question of fact, we must uphold the district court's finding unless it is not supported by substantial evidence or clearly erroneous. We hold that the district court's finding that Westside's failure to provide timely notice

---

6. Westside concedes that it failed to exercise ordinary care in meeting the notification requirements of Regulation J.

of dishonor only caused Northwest to incur a loss of $10,286.00 is based on substantial evidence. At the time Northwest paid the checks presented by the Kearney Bank, the Regulation J deadline had passed only for check number 1685 in the amount of $10,286.00. With respect to the other four checks presented to Westside for payment, Westside was not obligated to give Northwest notice of dishonor until after Northwest paid the checks presented by the Kearney Bank.[7]

■ We also reject Westside's argument that the district court erred in awarding Northwest $10,286.00 in damages. Specifically, Westside contends that the district court's judgment awarding Northwest $10,286.00 in damages is inconsistent with its findings of fact. The district court found that Westside's failure to exercise ordinary care in meeting the notification requirements caused Northwest to incur a loss of $10,286.00 but that Northwest's policy of permitting depositors to withdraw funds the day after they were deposited caused Northwest to lose $32,842.43. We find no internal inconsistency in the district court's opinion. We agree with the district court that Northwest would have taken appropriate measures to prevent a loss of $10,286.00 if Westside had provided Northwest with timely notification of its refusal to pay check number 1685. We note that on December 4, 1986, Northwest placed a hold on the Pisa account in the amount of $11,133.00 shortly after the Kearney Bank notified it that a check in that amount was being returned. Presumably, Northwest also would have placed a hold on the Pisa account in the amount of $10,286.00 if

Westside had given Northwest timely notice of its refusal to pay check number 1685.

Good Faith

■ Regulation J provides in part:

A paying bank that fails to act in good faith in meeting the [notification] requirements ... may be liable for other damages, if any, suffered by the depository bank as a proximate consequence.

12 C.F.R. § 210.12(c)(6). Northwest argues the district court should have awarded Northwest an additional $32,842.43 in "other damages" because Westside acted in bad faith. Specifically, Northwest contends that Westside knew it was involved in a check kiting scheme prior to the Regulation J deadline for check number 1685 and that Westside intentionally failed to give Northwest adequate notice of its refusal to pay the five Parkfair checks to shift any loss to Northwest. Westside responds that the good faith issue is not properly before this court because Northwest failed to include that issue in its pretrial order. *See Lane v. Geiger–Berger Assoc.*, 608 F.2d 1148, 1152–53 (8th Cir.1979) (finding pretrial order supersedes the pleadings and establishes the issues to be considered at trial).

Northwest did not specifically raise the issue of Westside's good faith in its pretrial order and the district court did not address that issue in its opinion. Assuming that Northwest's pretrial order encompassed the good faith issue, we conclude that "other damages" are inappropriate. Northwest still would have incurred a loss of $32,842.43 even if Westside had complied with the requirements of Regulation J. There-

---

7. Northwest contends that the court should have presumed that it incurred a loss equal to the face value of the Parkfair checks as a result of Westside's failure to exercise ordinary care by providing inadequate notification. In *Marcoux*, a case decided under the Uniform Commercial Code, we held that plaintiffs who sold property in exchange for sight drafts could recover damages from a bank only if they showed they "had at least a reasonable chance to collect" had the bank returned the unpaid drafts seasonably. 572 F.2d at 655; *see also Appliance Buyers Credit Corp.*, 708 F.2d at 294. We stated that "[i]t is not enough to show that by a fortuitous combination of unlikely events there was a dim hope

of collection." *Marcoux,* 572 F.2d at 655. In light of the similarity between Regulation J and the Uniform Commercial Code, we conclude that Northwest, like the plaintiff in *Marcoux,* had the burden of proving that it would have avoided part or all of the loss if it had received timely notice of dishonor. The district court reviewed Northwest's evidence, including Northwest's assertion that it would have frozen the Pisa account if it had known of Westside's dishonor of check number 1685, and properly found that no more than $10,286.00 of Northwest's loss could be attributed to Westside's failure to exercise ordinary care.

fore, even if Westside acted in bad faith in meeting the notification requirements, that did not cause Northwest to suffer "other damages" totalling $32,842.43.

Accordingly, the judgment of the district court is affirmed.