Michael L. KEHM, Administrator of the
Estate of Patricia Ann Kehm,
Deceased, et al., Plaintiffs,

v.

The PROCTER & GAMBLE
COMPANY, Defendant.

No. C 80–119.

United States District Court,
N.D. Iowa,
Cedar Rapids Division.

June 29, 1982.

Tom Riley, Peter C. Riley, T. Todd Becker, Cedar Rapids, Iowa, for plaintiffs.

John W. Allured, San Francisco, Cal., Mark B. Hutton, Wichita, Kan., James D. Todd, Jackson, Tenn., James B. Brien, Mayfield, Ky., for amicus curiae parties.

Timothy S. White, Steven K. Warbasse, J. Richard Johnson, Cedar Rapids, Iowa, Thomas S. Calder, Frank C. Woodside, III, Cincinnati, Ohio, for defendant.

Michael A. Guidicessi, Des Moines, Iowa, for Des M. Register, etc.

Lawrence Blades, Richard G. Hileman, Jr., Cedar Rapids, Iowa, for KCRG.

Michael McDermott, Allan W. Vestal, Cedar Rapids, Iowa, for KGAN.

John C. Monroe, Cedar Rapids, Iowa, for Judge McManus on Mandamus action in Appeals Court.

## ORDER

McMANUS, Chief Judge.

This matter is before the court on defendant's resisted motions for judgment notwithstanding the verdict and for a new trial, filed May 3, 1982, its unresisted motion to stay imposition of costs, and its resistance to plaintiffs' bill of costs, both of which were filed May 14, 1982. Ruling in accordance with order.

This is a products liability action arising out of the death of Patricia Kehm. Plaintiffs, Mrs. Kehm's surviving husband and children, alleged that Mrs. Kehm died of Toxic Shock Syndrome (TSS) proximately caused by her use of Rely tampons, a product designed and manufactured by defendant, that were defective and unreasonably dangerous. On April 21, 1982, a jury returned a verdict of $300,000.00 for plaintiffs on their claim for compensatory damages. The jury found for defendant on plaintiffs' claim for punitive damages.

The court has before it defendant's motions for judgment notwithstanding the verdict and a new trial, its motion to stay imposition of costs, and its resistance to plaintiffs' bill of costs. These matters will be taken in turn. In this regard, no attempt to detail the facts of this case will be made at this time. Rather, in ruling on the various questions now before it, the court will set out the facts to the extent necessary to achieve that end.

### I.

■ In its motion for judgment notwithstanding the verdict, defendant challenges the sufficiency of the evidence of product defectiveness and of causation. To rule on this motion, the court has to determine whether the jury's verdict was based on "substantial evidence." *Duncan v. St. Louis—San Francisco Ry. Co.*, 480 F.2d 79, 83 (8th Cir.1973); *Marcoux v. Mid-States Livestock, Inc.*, 429 F.Supp. 155, 158

(N.D.Ia.1977), *aff'd*, 572 F.2d 651 (8th Cir. 1978); *Volkswagen of Iowa City, Inc. v. Scott's Inc.*, 165 N.W.2d 789, 793 (Iowa 1969).[1] The "substantial evidence" test requires that the jury verdict be supported by more than a "scintilla" of evidence. *Marcoux*, 429 F.Supp. at 158–59. In making this determination, the court must examine the record; it must review the testimony, but it may not assign credibility or weight to the witnesses and evidence. *Simpson v. Skelly Oil Co.*, 371 F.2d 563, 567 (8th Cir.1967); *Marcoux*, 429 F.Supp. at 158–59. The court may not substitute its judgment of the facts for that of the jury, and it must view the evidence in the light most favorable to the plaintiffs. *Tennant v. Peoria & P.U. Ry. Co.*, 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944); *Marcoux*, 429 F.Supp. at 159. Hence, motions for judgment notwithstanding the verdict are sparingly granted, and then "only where the evidence points *all one way* and is susceptible of *no* reasonable inferences sustaining the position of the non-moving party." *Id.* (quoting *Giordano v. Lee*, 434 F.2d 1227, 1231 (9th Cir.1970), *cert. denied*, 403 U.S. 931, 91 S.Ct. 2250, 29 L.Ed.2d 709 (1971)) (emphasis in original).

The thrust of defendant's motion is that the plaintiffs failed to prove that Rely tampons were defective. In making this assertion, defendant suggests that the only evidence offered on this point was the expert opinion of Dr. Tierno that the carboxymethylcellulos absorbents in Rely tampons act as a catalyst for the staphylococcus aureus, or "staph," infection implicated in TSS. This evidence, defendant argues, should be rejected, as it amounts to nothing more than speculation and conjecture; defendant strenuously asserts that Dr. Tierno's conclusions are scientifically invalid because he is the only person who has reached them, because his results have never been duplicated, and because the medical research in this area is incomplete.

From the premise that no evidence exists on the issue of defectiveness, defendant next asserts that there exists no evidence of a failure to warn on its part. In essence, defendant argues that no warning was necessary because the product was not defective.

Lastly, defendant maintains that plaintiffs failed to prove that the Rely tampons used by Mrs. Kehm proximately caused her illness or death. Defendant contends that Dr. Tierno was the only witness to testify that Rely tampons cause TSS and that his testimony should be rejected. Also, defendant contends that Mrs. Kehm did not contract and die from TSS, but that she died from a uterine infection unassociated with staphylococcus aureus.

The court, in accordance with the legal standards governing this matter, must disagree with defendant.

This case was submitted only on the theory of strict liability in tort, and plaintiffs identified two varieties of product defectiveness: (1) defective design, and (2) failure to warn. The jury returned a general verdict for plaintiffs on this claim.[2]

■ With regard to the first theory, plaintiffs offered evidence, and argued, that the Rely tampons used by Mrs. Kehm were defective and unreasonably dangerous because the carboxymethylcellulos absorbents present in them acted as a catalyst for the development of a staph infection and resulting TSS. With regard to plaintiffs' second theory, plaintiffs offered

---

1. Historically, in cases premised upon diversity jurisdiction, federal courts have encountered some difficulty in determining whether state or federal standards should be applied to test the sufficiency of the evidence that purportedly supports a jury verdict. *See, e.g., Harwell v. Westchester Fire Ins. Co.*, 508 F.2d 1245 (8th Cir. 1968). In this case, this conflict as to the choice of law is of no significance, since "substantial evidence" is the standard utilized by both Iowa and federal courts.

2. The jury returned the following verdict on plaintiffs' claim for compensatory damages:

We find for the plaintiff[s] and assess the amount of recovery at $300,000.00 on [their] claim for compensatory damages.

Accordingly, the jury foreman did not sign the following verdict form:

We find for the defendant on this claim.

evidence, and argued, that (1) defendant either knew or should have known of the defective design just described, and (2) that, even if defendant did not have knowledge or reason to know of the details of that design defect, defendant certainly knew or should have known of epidemiological studies that showed a strong statistical association between menstrually related cases of TSS and the use of Rely tampons.

As framed, defendant's argument that plaintiffs failed to prove the existence of a defect in Rely tampons is viewed by the court as untenable. While the court recognizes that the scientific community is not in complete accord as to the cause of TSS and the scientific link between TSS and Rely tampons, and that defendant produced a greater number of experts on this issue than plaintiffs did, the fact remains that plaintiffs' expert, Dr. Tierno, expressed an expert opinion on these points favorable to plaintiffs and the jury's verdict. Defendant makes no claim that the court erred in allowing Dr. Tierno to testify as an expert witness. That being the case, and the court being satisfied that Dr. Tierno's expert testimony was properly admitted,[3] defendant is left with the long established rule that the jury is entitled to assign such weight to expert testimony as it sees fit. *E.g. Skar v. City of Lincoln, Neb.*, 599 F.2d 253 (8th Cir.1979). Stated differently, Dr. Tierno's testimony is sufficient to uphold the jury's verdict.

Defendant's argument regarding proof of defectiveness must be rejected for another reason, as well. As indicated, plaintiffs' theory of product defectiveness turned also on defendant's failure to warn Mrs. Kehm of the danger associated with the use of Rely tampons.[4] This failure to warn theory turned in part on the existence of epidemiological studies that concluded, according to another of plaintiffs' experts, Dr. Dan, that a strong statistical association exists between the use of Rely tampons and the incidence of menstrually related TSS cases. This testimony of Dr. Dan, together with the evidence that defendant knew or should have known of the studies and their conclusion, amounts to substantial evidence in support of the jury's verdict on plaintiffs' failure to warn theory. *See Pritchard v. Liggett & Myers Tobacco Co.,* 295 F.2d 292, 299–300 (3rd Cir.1961).[5]

The foregoing discussion effectively eliminates the need to further discuss defendant's second argument, to-wit, that there was no duty for it to warn against the use of Rely tampons because there was no evidence that Rely tampons were defective. Therefore, the court proceeds to defendant's last contention.

Defendant maintains that plaintiffs failed to prove that Mrs. Kehm's death was proximately caused by her use of Rely tampons or even that she died of TSS. Again, the court disagrees.

---

**3.** Dr. Tierno is a clinical microbiologist who works at the New York University Medical Center, New York City, New York. He has a baccalaureate degree in biology, with a concentration in microbiology, a master of science degree in microbiology, and a doctorate degree in microbiology concentration. In addition to his experience as a working clinical microbiologist, Dr. Tierno also has taught courses in microbiology to nurses, medical residents, and physicians.

**4.** The court gave the following instruction on failure to warn:

Some products may have dangerous qualities or characteristics that are not generally known to the user or consumer. In such cases, a manufacturer who knows, or as a reasonably prudent person should know, of such qualities or characteristics, has a duty to give adequate warning for the use of the product. Failure to do so constitutes a defect unreasonably dangerous to the user or consumer.

**5.** *Pritchard* held that the existence of studies showing a "relationship" or "connection" between cigarette smoking and lung cancer supported the trial court's submission to the jury of plaintiff's failure to warn theory of recovery in his negligence action against defendant for his personal injuries associated with his lung cancer. 295 F.2d at 299–300. As in *Pritchard,* the submission of this theory in this case turned on what defendant knew or should have known, n. 4, *supra,* and the evidence here was that defendant knew of the association between the use of Rely tampons and the contraction of TSS.

■ Taking the second contention first, it is sufficient merely to detail the evidence in support of the jury's verdict: (1) the testimony of Doctors Jacobs, Quetsch, and Skopec, the treating and consulting physicians and the pathologist, respectively, that Mrs. Kehm died of TSS; (2) Dr. Skopec's autopsy report; (3) the testimony of Dr. Dan regarding the case study definition of TSS; (4) the testimony of Dr. Tierno regarding the role played by staphylococcus aureus in TSS; (5) Mr. Kehm's testimony concerning Mrs. Kehm's symptoms just prior to her death; and (6) the testimony of Dr. Shirk, Mrs. Kehm's family physician, concerning the absence of any pelvic-area infections just ten days prior to Mrs. Kehm's death. While the court recognizes that defendant believes Mrs. Kehm died as the result of a gram negative shock syndrome and not TSS, and that its expert, Dr. McKinivan, testified to that end, the court, in light of the evidence just detailed, cannot disregard the jury's verdict to the contrary.

■ Similarly, the court must reject defendant's contention that the death of Mrs. Kehm was not proved to be proximately caused by Rely tampons. Through Mr. Kehm, Colleen Jones and Jean Robinson, Mrs. Kehm's sister and mother, respectively, and Lois Sterenchuk, the emergency room nurse who cared for Mrs. Kehm on the day of her death, plaintiffs proved that Mrs. Kehm used Rely tampons during the time period leading up to, and on the day of, her death; through Dr. Dan and Dr. Tierno, plaintiffs proved the statistical and scientific/medical roles Rely tampons play in the causation of TSS. Moreover, the inference that Rely tampons proximately caused Mrs. Kehm's death is strong—Mrs. Kehm, an otherwise healthy 25 year old woman, died just four days after the commencement of her menstrual period and her corresponding use of Rely tampons.

In summary, the standards governing the disposition of a motion for judgment notwithstanding the verdict and the entire record of this case compel the court to deny defendant's motion in all respects.

## II.

Defendant's motion for new trial has several bases: (1) the weight of the evidence; (2) evidentiary rulings by the court; (3) the court's refusal to instruct the jury in accordance with two of defendant's proposed instructions; and (4) conduct on the part of plaintiffs' attorney, Tom Riley. After setting out the legal standards governing the consideration of a motion for a new trial, the court will address these bases in turn.

■ Rule 59 of the Federal Rules of Civil Procedure provides that a new trial may be granted in an action in which there has been a jury trial for any of the reasons "for which new trials have heretofore been granted in actions at law in the courts of the United States." FRCP 59(a). That this rule of procedure governs in this diversity action is beyond doubt. *E.g. Pitts v. Electro-Static Finishing, Inc.*, 607 F.2d 799, 802 (8th Cir.1979).

■ Motions for a new trial are independent from motions for judgment notwithstanding the verdict; they are governed by different legal principles, and trial courts have greater latitude in ruling on them than they do in ruling on motions for judgment notwithstanding the verdict. *Nodak Oil Co. v. Mobil Oil Corp.*, 533 F.2d 401, 410 (8th Cir.1976). Indeed, in considering such a motion, the trial court is governed by its sound discretion. *E.g. Bates v. Hensley*, 414 F.2d 1006 (1st Cir. 1969). As a general proposition, though, new trials are not granted unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done. *Seven Provinces Ins. Co. Ltd. v. Commerce & Industry Ins. Co.*, 65 F.R.D. 674, 688 (N.D.Mo. 1975); 11 C. Wright & A. Miller, *Federal Practice & Procedure* § 2308, at 32 (1973) (hereinafter cited as *Wright & Miller*). The burden of proving the propriety of a new trial is, of course, on the moving party. *Hansen v. Barrett*, 186 F.Supp. 527, 532 (D.Minn.1960); 11 *Wright & Miller* § 2308, at 32.

■ As indicated in FRCP 59(a), there exists no precise and definitive list of grounds for a new trial. It is clear, however, that the grounds asserted by defendant in this motion generally are recognized as valid and common. 11 *Wright & Miller* § 2805. It is equally clear that the court, as a prerequisite to granting a new trial on any ground, must satisfy itself that the error or defect in the earlier trial affected the "substantial rights" of defendant. FRCP 61; 11 *Wright & Miller* § 2305, at 41.

### A.

■ Defendant gives the greatest attention by far to evidentiary rulings of the court.[6] For purposes of ease and simplicity of analysis, the evidence that was the object of these challenged rulings fairly may be categorized as follows: (1) Dr. Tierno's in-court demonstration; (2) numerous epidemiological studies and the testimony of Dr. Dan that was based on some or all of them; (3) a letter from the Centers for Disease Control (CDC) to the Health Industry Manufacturers Association, an organization of which defendant is a member; and (4) certain testimony concerning defendant's wealth.

### (1)

■ On the fourth day of trial, the court, over defendant's objection, allowed Dr. Tierno to perform an in-court scientific demonstration. Defendant objected on the grounds that the evidence was irrelevant because not performed under conditions similar to those present in the human vagina and that, if relevant, the evidence was confusing and unduly prejudicial under FREv 403.

As a foundational requirement, in-court experiments, to be legally relevant, must meet the test of similarity of conditions, *McCormick's Handbook of the Law of Evidence* § 215, at 536 (2d ed. 1972) (hereinafter cited as *McCormick*), although this "substantial similarity" requirement is viewed by most courts as a relative one. *Id.* § 202, at 485–86 & n. 15 (citing cases). Even though relevant, however, such evidence properly may be rejected where its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." FREv 403; *see McCormick* § 215, at 536. With these legal precepts in mind, the court reaffirms its earlier decision to admit Dr. Tierno's experiment.

Dr. Tierno's experiment consisted of adding an enzyme, known as Betaglucosidase, to carboxymethylcellulose (CLD) chips taken from a Rely tampon, with the intended result being the liquification of the chips into glucose. This experiment was meant to illustrate Dr. Tierno's theory that the staph infection associated with Toxic Shock Syndrome is caused by Rely tampons—stated as simply as possible, the theory is that the glucose acts as a substrate (food) for staph aureus bacteria, which results in

---

6. Defendant seeks a new trial on the additional ground that the verdict in this case is not supported by the weight of the evidence. This is a recognized ground on which to grant a new trial. *Byrd v. Blue Ridge Rural Elec. Co-op, Inc.,* 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958). In considering such a matter, as opposed to a motion for judgment notwithstanding the verdict, the court is not required to take the view of the evidence most favorable to the plaintiffs; indeed, the court may set aside the verdict even though there is substantial evidence to support it. *Bates v. Hensley,* 414 F.2d 1006, 1011 (8th Cir.1969); *Hover v. MacDonald Engineering Co.,* 183 F.Supp. 427, 430 (S.D.Iowa 1960), *aff'd,* 290 F.2d 301 (8th Cir.1961). However, the court should be reluctant to set aside a verdict when there is a sharp dispute in conflicting substantial evidence. *Id.;* see 11 *Wright & Miller* § 2806.

The court believes that it would be inappropriate to grant a new trial on this ground. As indicated in Part I of this opinion, the court views the resolution of the factual issues present in this case as a matter properly left to the jury's discretion.

Similarly, the court rejects defendant's contention that the court erred in admitting evidence relating to plaintiffs' punitive damage claim. The evidence about which defendant complains—evidence concerning defendant's financial worth and its advertising and promotion expenditures—was admissible because plaintiffs had established a prima facie case of wanton and reckless conduct on the part of defendant. (See, for example, exhibits 33 & 98).

898

an increased production of staph aureus toxins; the increased production of toxins, combined with other factors, is believed by Dr. Tierno to result in TSS.

The grounds for defendant's relevancy objection are several: (1) the temperature of the human vagina was not reproduced in the courtroom; (2) the experiment did not involve the various fluids, micro-organisms, proteins, etc., also present in the vagina; and (3) the enzyme used by Dr. Tierno was impure. Dr. Tierno testified about each of these matters. With regard to temperature, he testified that the lower courtroom temperature would affect his experiment only by slowing down the liquification of the CLD chips; with regard to the exclusion of other materials found in the vagina, he testified that this would not scientifically affect his experiment—the desired reaction would occur with or without the presence of these other materials; with regard to the purity of the enzyme used by him, he testified in direct opposition to defendant's position—he maintained that the enzyme was of extremely high-grade commercial quality. In light of this testimony, the court views the conditions of Dr. Tierno's experiment to have been sufficiently similar to those present in the vagina to satisfy the foundational relevancy requirements.

Similarly, defendant's assertion of undue prejudice, confusion of issues, or misleading of the jury is also rejected. The experiment's purpose was highly relevant, in view of Dr. Tierno's opinion on causation. To the extent that the experiment resulted in any prejudice, confusion, or misdirection, a result the court does not believe obtained, the probative value of the experiment clearly demanded receipt of this evidence. Defendant's objections to admission of this evidence were more properly directed to the weight of the evidence, not to its admissibility. Indeed, the court believes defendant very effectively neutralized this evidence through its cross-examination of Dr. Tierno and through the testimony of its own experts.

(2)

During the course of the trial of this case, the court both admitted into evidence epidemiological studies and allowed Dr. Dan to testify about these studies. The court's rulings were made over the objections by defendant that the studies were inadmissible under both the hearsay rule, FREv 802, and FREv 403 and that Dr. Dan's testimony about these studies also was inadmissible under the hearsay rule. Plaintiffs, in their response to defendant's March 3, 1982, motion in limine directed to these matters, argued that the studies were admissible under several recognized exceptions to the hearsay rule and that Dr. Dan's testimony, as that of an expert, could be based on hearsay. Also, plaintiffs argued that rule 403 did not require the exclusion of the studies. Because the court agrees with plaintiffs, this basis for defendant's motion for a new trial must also be rejected.

(a)

The three studies in question, identified by exhibit numbers 87, 88, and 104, respectively, are known as CDC Case-Control Study # 2 (CDC II), Tri-State Toxic-Shock Syndrome Study: Epidemiological Findings (Tri-State Study), and TSS Study by the Minnesota State Health Department (Minnesota Study). Each was the result of efforts by a governmental body—CDC II was the product of the Centers for Disease Control, a branch of the United States Department of Health and Human Services; the Tri-State study was the joint product of the Minnesota Department of Health, the Wisconsin Division of Health, the Iowa Department of Health, and the Universities of Minnesota and Iowa; and the Minnesota study, obviously, was the product of the Minnesota Department of Health. And each entailed a statistical study of the relationship between tampon use and the incidence of menstrually related cases of TSS. Plaintiffs offered these studies for two purposes, to prove causation and to prove the elements of their punitive damage claim.

Defendant argues that each study was inadmissible as hearsay. Plaintiffs do not contend that these studies are not hearsay. Rather, they contend that the studies were admissible under one or more of the exceptions to the hearsay rule, citing FREv 803(6), 803(8)(A), (B), and (C), 803(18), and 803(24). The court agrees that the studies were admissible under FREv 803(8)(C), and, accordingly, it will limit its analysis to that rule.[7]

Rule 803(8)(C) provides in pertinent part: (8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (C) in civil actions ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness [are not excluded by the hearsay rule].

Under defendant's interpretation, this rule contains four criteria that must be met before it operates to authorize the admission of a given piece of evidence: (1) the investigation of the public office or agency must have been authorized by law; (2) the report, etc., must set forth "factual findings;" (3) the declarant must have had first-hand knowledge; and (4) the research must be trustworthy. Of these four criteria, defendant advances arguments with respect to the last three, only; defendant concedes that each of the studies here under examination resulted from legally authorized investigations by public offices or agencies.[8] The court will address each of defendant's arguments in turn.[9]

Rule 803(8)(C), according to Professor Weinstein, addresses itself to what are known as investigative or "evaluative" reports. 4 *Weinstein's Evidence*

¶¶ 803(8)[01] & [03]. Unlike public records and reports covered by rule 803(8)(A) & (B), the admissibility of this type of record was open to question prior to the adoption of the Federal Rules of Evidence. This was due in large part to judicial reluctance to admit reports not completely based on personal knowledge and to admit reports over objections based on the opinion rule. *Id.* ¶ 803(8)[03], at 803–200—02. Since the promulgation of rule 803(8)(C), these concerns, and the question of admissibility, have been largely resolved.

Defendant's first argument implicates the judicial concern spawned by objections based on the opinion rule. Defendant maintains that the phrase "factual findings" contained in rule 803(8)(C) must be given a restrictive definition that would exclude any form of opinion or diagnosis or evaluation. This matter has received considerable attention in the decisions and commentaries, *e.g. id.;* Annot., 47 A.L.R. Fed. 321 (1980) (collecting cases), and the concensus is that the phrase "factual findings" is to be given an expansive definition that would include more than just simple facts. *Melville v. American Home Assur. Co.*, 584 F.2d 1306 (3rd Cir.1978); *Lloyd v. American Export Lines, Inc.*, 580 F.2d 1179 (3rd Cir.), *cert. denied sub nom. Alvarez v. American Export Lines, Inc.*, 439 U.S. 969, 99 S.Ct. 461, 58 L.Ed.2d 428 (1978); *Baker v. Elcona Homes Corp.*, 588 F.2d 551 (6th Cir.1978), *cert. denied,* 441 U.S. 933, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1979); *Wetherill v. University of Chicago,* 518 F.Supp. 1387 (N.D.Ill.1981); *Zenith Radio Corp. v. Matsushita Electrical Industrial Co., Ltd.,* 505 F.Supp. 1125 (E.D.Pa. 1980); *United States v. American Tel. & Tel. Co.,* 498 F.Supp. 353 (D.D.C.1980); 4 *Weinstein's Evidence* ¶ 802(8)[03], at 803–

---

**7.** As support for the conclusion that rule 803(8)(C) governs the disposition of this matter, see *Robbins v. Whelan,* 653 F.2d 47 (1st Cir.), *cert. denied,* 454 U.S. 1123, 102 S.Ct. 972, 71 L.Ed.2d 110 (1981), and 4 D. Louisell & C. Mueller, *Federal Evidence* § 455, at 729 (1980).

**8.** That rule 803(8)(C) applies to state public records and reports is not questioned. *Zenith Radio Corp. v. Matsushita Electrical Industrial*

*Co., Ltd.,* 505 F.Supp. 1125, 1144 n. 11 (E.D.Pa. 1980).

**9.** A good background discussion of the history and purposes of rule 803(8) appears at 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 803(8)[01] & [03] (1981) (hereinafter cited as *Weinstein's Evidence* ).

205—08 ("A broader conception of the phrase ... is consonnant [sic] with the Advisory Committee's Note, which accepted 'evaluative reports' as being within the scope of Rule 803(8)(C), and with the general thrust of the Federal Rules of Evidence."); *cf. Meder v. Everest Jennings, Inc.,* 637 F.2d 1182 (8th Cir.1981) (citing *Baker,* 588 F.2d 551, favorably). *Contra, Complaint of American Export Lines, Inc.,* 73 F.R.D. 454 (S.D.N.Y.1977). The following comment in the *AT & T* decision is illustrative of the rationale underlying this view:

> The rationale for the admissibility of factual findings contained in public records, as explained in the cases cited above, lies in their *fundamental trustworthiness.* The guarantee of trustworthiness does not necessarily reside in the contents of the records, be they facts or conclusions, but rather in their source. "[P]ublic records or reports, by virtue of their being based on legal duty and authority, contain sufficient circumstantial guarantees of trustworthiness to justify their use at trial." ... *Since the reliability of the factual findings results essentially from the fact that the public official concerned is pursuing an investigation authorized by law, there is no reason not to admit the findings simply because they tend towards the conclusory rather than the factual end,* unless, as Rule 803(8)(C) further provides, the sources of information or other circumstances indicate lack of trustworthiness.

*United States v. American Tel. & Tel. Co.,* 498 F.Supp. at 360. (citations omitted) (emphasis added). *See also,* 4 *Weinstein's Evidence* ¶ 803(8)[03], at 803–206 ("Rule 803(8)(C) should be interpreted in accord with this treatment of 'opinion' evidence. If the report states a conclusion that would be helpful—and is reliable—it should be admitted.")

The central inquiry with regard to the phrase "factual findings," then, is whether the report is trustworthy. After addressing defendant's argument concerning firsthand knowledge, the court will turn its attention to this matter.

Notwithstanding rule 803(8)(C)'s silence, defendant maintains that the investigative report's preparer must have first-hand knowledge of the report's contents before the report is admissible under the public record hearsay exception, basing this contention on the Advisory Committee's general comments regarding rule 803.[10] The authorities are against defendant on this point also. Again, the real issue is one of reliability, as illustrated in this language from the *AT & T* case:

> Defendants contend that the test case materials which are "factual findings" within 803(8)(C) must nevertheless be excluded in most instances because they constitute "multiple hearsay," ... that is, the matters which the government seeks to prove through these decisions were not within the first-hand knowledge of the Commissioners and staff who issued the decisions.

Although the multiple hearsay problem has been mentioned with regard to Rule 803(8)(C) (see *Hackley v. Roudebush, supra,* 520 F.2d [108] at 156, n. 195 (D.C. Cir.1975)), it has generally been held that the author of the report or decision is not necessarily required to have first-hand knowledge of the facts upon which his findings are based. *United States v. Smith,* 521 F.2d 957 (D.C.Cir.1975); *Fraley v. Rockwell International Corp.,* 470 F.Supp. 1264, 1267 (S.D.Ohio 1979). Where the trial judge finds the investigative findings to be reliable, their admissibility under Rule 803(8)(C) is warranted even if the findings are not the result of the direct personal knowledge of the author of the findings. 4 *Weinstein's Evidence,* ¶ 802(8)[03], at 803–203–04. Thus, the multiple hearsay issue is reducible to

---

10. The committee's comment reads:
    In a hearsay situation, the declarant is, of course, a witness, and neither this rule nor Rule 804 dispenses with the requirement of firsthand knowledge. It may appear from his statement or be inferable from circumstances. See Rule 602 [Federal Rules of Evidence].

one of the trustworthiness of the factual findings.

498 F.Supp. at 363–64. The court turns, then, to the issue of trustworthiness.

■ Rule 803(8)(C) excepts from the hearsay rule public records containing factual findings "unless the sources of information or other circumstances indicate lack of trustworthiness." In this case, the burden was on defendant, as the party disputing admissibility, to prove the factual finding to be untrustworthy. *Baker v. Elcona Home Corp.*, 588 F.2d at 558; *United States v. American Tel. & Tel. Co.*, 498 F.Supp. at 364.

The Advisory Committee Notes list a number of factors relevant to the determination of whether a public investigatory report is untrustworthy: (1) the timeliness of the investigation; (2) the special skill or expertise of the investigator; (3) whether a hearing was held and the level at which conducted; and (4) possible motivation problems. Defendant's arguments tangentially touch on only one of these factors— the special skill or expertise of the investigator.

Defendant maintains that the three studies are untrustworthy because of their methodology and that the Tri-State and Minnesota studies are untrustworthy because they are preliminary in nature and have never been published. Neither contention has any merit.

■ With regard to the matter of methodology, each study, according to plaintiffs' expert Dr. Dan, employed statistical procedures and methods both recognized and accepted in the field of epidemiology. This testimony was not challenged.[11] Rather, defendant sought to establish that the results of each study are flawed due to one form or another of statistical bias. To this end, defendant presented its own expert, Dr. Feinstein. The testimony of Dr. Dan and Dr. Feinstein, each of whom is recognized as an expert in the field of epidemiology, was in direct conflict with regard to

this matter of bias. This being the case, the court feels that the proper course was to admit the studies and leave the question of their weight, and the weight of the testimony of the two experts, to the jury. *See Bean v. United States*, 533 F.Supp. 567, 578–79 (D.Colo.1980) (swine flu case).

Similarly, the fact that the Tri-State and Minnesota studies are preliminary does not affect their admissibility, but goes to their weight. *Id.*

■ The bulk of defendant's argument on this issue of trustworthiness concerns the fact that it was precluded from cross-examining any of the sources of the information on which the studies relied. But as has already been shown, the mere fact that the public investigatory report relies on hearsay is not enough to prevent the report's admission into evidence. *United States v. American Tel. & Tel. Co.*, 498 F.Supp. at 363–64. The court views the results of the studies at issue here as reliable. The studies were prepared by professional, disinterested, public officials according to statistical research techniques accepted in the field of epidemiology.[12] *See Reyes v. Wyeth Laboratories*, 498 F.2d 1264 (5th Cir.), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974); *Bean v. United States*, 533 F.Supp. 567 (D.Colo. 1980). Also persuasive is the fact that these studies, which were conducted totally independently of one another, each reached the same conclusion—that a statistical association exists between TSS and tampon use.

Plaintiffs and defendant have each cited a plethora of cases in support of their respective positions on the question of the applicability of rule 803(8)(C). While none of them is controlling, a few are helpful. The first is *Wetherill v. University of Chicago*, 518 F.Supp. 1387 (N.D.Ill.1981), a damage action arising out of injuries allegedly sustained as the result of the ingestion by plaintiff's mother of DES during pregnancy. The public report in ques-

---

**11.** See n. 14, *infra*, and accompanying text.

**12.** See n. 14, *infra*, and accompanying text.

tion was a Health, Education & Welfare (HEW) task force's report on the scope and nature of existing research in the area of DES-related injuries. While this report was ruled inadmissible, the district court indicated that its view would have been different had the report been an actual factual investigation and had membership of the task force not included plaintiff's mother and other persons directly involved in DES litigation. 518 F.Supp. at 1390–91.

*Baker v. Elcona Homes Corp.*, 588 F.2d 551 (6th Cir.1978), is also pertinent to this action. There, the report in question was a policeman's traffic accident report. It was held that this report was admissible on the issue of negligence notwithstanding the inclusion of the policeman's conclusions and opinions as to the cause of the accident. Similarly, the Eighth Circuit in *Meder v. Everest Jennings, Inc.*, 637 F.2d 1182 (8th Cir.1981), adopted the view that such reports as that involved in *Baker* are admissible if trustworthy. 637 F.2d at 1187–88 & n. 8.

In *United States v. School District of Ferndale*, 577 F.2d 1339 (6th Cir.1978), a school desegregation case, the trial court's admission of a HEW hearing examiner's findings and conclusions that defendant was guilty of illegal segregation was upheld under rule 803(8)(C). And in *Reyes v. Wyeth Laboratories*, 498 F.2d 1264 (5th Cir.1974), the Fifth Circuit, in a polio vaccine decision pre-dating the promulgation of rule 803(8)(C), upheld the trial court's admission of a county health department document containing statistics and records pertaining to the incidence of polio cases in the county. The court analyzed the question of admissibility in terms of the document's "necessity and trustworthiness." With regard to the trustworthiness factor, the court said:

> The motivation for accuracy in a record prepared by a public-health official concerning outbreaks of serious disease within an area committed to his charge is obvious. A brand of expertise

sufficient to insure accuracy may be assumed.

498 F.2d at 1288. Lastly, in *McRae v. Califano*, 491 F.Supp. 630, (E.D.N.Y.), *rev'd on other grounds*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), a Hyde amendment/abortion case, the court, without commenting on the question of admissibility, cited and relied on epidemiological studies.

To summarize, the court holds that the epidemiological studies in question were properly viewed as falling within the public records hearsay exception covered by rule 803(8)(C). To determine that they were properly admitted into evidence, the court must consider defendant's rule 403 argument.

(b)

█ Even if the studies fit an exception to the hearsay rule, defendant argues, they should have been kept out of evidence under FREv 403 because they were "untrustworthy, preliminary and not probative." For all of the reasons set out above, the court rejects this contention. These studies were highly probative on the issue of causation—they all concluded that an association between tampon use and menstrually related TSS cases exists. *See Migliorini v. United States*, 521 F.Supp. 1210 (M.D. Fla.1981) (swine flu case; epidemiological evidence only evidence of causation of Guillain Barre Syndrome). Furthermore, they were probative on the issue of defendant's liability for failure to warn, *Pritchard v. Liggett & Myers Tobacco Co.*, 295 F.2d 292 (3rd Cir.1961),[13] and for punitive damages. *Pringle Tax Service, Inc. v. Knoblauch*, 282 N.W.2d 151 (Iowa 1979) (punitive damages turn on wanton or reckless act or omission). To this extent, of course, they may have been prejudicial to defendant, but this is not the kind of prejudice against which rule 403 is meant to protect.

Therefore, the epidemiological studies were properly admitted, and a new trial is not warranted on this ground.

13. See n. 5, *supra.*

#### (c)

■ Defendant's last contention with regard to these studies is that the court erred in allowing Dr. Dan to base his testimony on them. This matter is governed by FREv 703, which provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subjects, the facts or data need not be admissible in evidence.

Dr. Dan and Dr. Feinstein both testified that experts in the field of epidemiology rely on studies of the kind in question here.[14] Furthermore, the court has already determined that the studies themselves were properly admitted into evidence. Therefore, this contention is rejected.

To conclude, the court holds that the studies and Dr. Dan's testimony regarding them were properly admitted into evidence.[15] A new trial, therefore, is not warranted on these grounds.

#### (3)

Defendant's next evidentiary-based contention is that the court erred in excluding from evidence defendant's exhibit FP, which is a letter from the director of the Bacterial Diseases Division of the Centers for Disease Control to the Health Industry Manufacturers Association. Defendant maintains that this letter was admissible to rebut Dr. Dan's testimony that the scientific issues surrounding TSS have been resolved. The Health Industry Manufacturers Association is an association of which defendant is a member, and exhibit FP shows that the CDC, as of March 5, 1982, was seeking funds from association members for further study of the cause of TSS. Defendant sought to introduce this letter through one of its employees. It did not attempt to introduce it through either its sender or its recipient.

The court ruled exhibit FP inadmissible under the hearsay rule. At the time of the offer, the court expressed the view that the letter was hearsay unless offered through the CDC or the trade association to which it was sent.

Defendant's theory of admissibility is unclear; it does not make a specific argument on the matter and it offers no authority for its contention. During trial, however, defendant made an offer of proof to the effect that one of its employees would testify that it received the letter from the manufacturers association in the ordinary course of business. Therefore, the court assumes that defendant attempted to have exhibit FP admitted under the business records exception to the hearsay rule.

■ The business records exception is contained in FREv 803(6). That rule provides:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, [is admissible].

Under this rule, a foundational requirement to the admission of a given record is the testimony of the record's custodian that

---

**14.** Additional support for this proposition appears in an article written by Drs. Feinstein and Ralph Horwitz and published in the April, 1979, issue of the American Journal of Medicine. This article was filed by defendant on April 1, 1982, as an addendum to its motion in limine of March 3, 1982.

**15.** These questions of the admissibility of the studies and the appropriateness of allowing Dr. Dan to base his opinion on them were addressed by Judge Finesilver in *Lampshire v. The Procter & Gamble Co.,* No. 80–F–1567 (D.Colo.), another TSS case. On March 8, 1982, Judge Finesilver ruled against defendant on these issues. His ruling was made orally; a copy of the transcript of that ruling is attached to this order as appendix I.

the record was kept in the course of a regularly conducted business activity and that it was the regular practice of that business activity to make that record. The case law clearly indicates that, in a situation such as this, the only proper custodians through whom this foundation may be laid are the sender and the recipient of the letter or their representatives. *Tashnizi v. Immigration & Naturalization Service*, 585 F.2d 781, 783 n. 1 (5th Cir.1978); *United States v. Reese*, 561 F.2d 894, 903 n. 18 (D.C.Cir.1977).

■ The court discerns another failing of exhibit FP—it is not a record, etc., of "acts, events, conditions, opinions, or diagnoses," as those terms are used in rule 803(6). *See* 4 *Weinstein's Evidence* ¶ 803(6)[06].

■ Lastly, the court, upon reflection since the time of the trial of this case, does not perceive the relevance of exhibit FP vis-a-vis Dr. Dan. Defendant offered exhibit FP ostensibly to impeach him. But the court does not understand that Dr. Dan ever took the position that all questions regarding the causation of TSS have been resolved. Furthermore, at the time exhibit FP was written, March of 1982, Dr. Dan was no longer employed at the CDC. Therefore, the views of CDC have no impeachment value with regard to Dr. Dan.

For all of the above reasons, the motion for a new trial on the ground that the court erred in rejecting the offer of exhibit FP is denied.

### (4)

■ Defendant's last assignment of error based on an evidentiary ruling pertains to plaintiffs' claim for punitive damages. Defendant complains of the admission of what it calls "collateral evidence" of defendant's wealth.

Prior to trial, the parties stipulated to dollar amounts representing defendant's net worth and net earnings. This was done for the purpose of submitting to the jury defendant's wealth. Defendant now maintains that the stipulated evidence was all that was admissible with regard to plain-

tiffs' claim for punitive damages. This contention is patently without merit. The Order of Final Pre-Trial Conference, the document in which this stipulation is contained, in no terms limits the parties to the evidence covered by their stipulations. The evidence about which defendant now complains was relevant and properly admitted.

### B.

The next basis for defendant's motion is the court's refusal to instruct the jury in accordance with two of defendant's proposed instructions. The first instruction addressed itself to Mrs. Kehm's so-called "idiosyncratic reaction" to TSS, and the second was directed to defendant's withdrawal of Rely tampons from the market. These matters will be taken in turn.

■ Defendant submitted to the court a proposed instruction that provided:

### IDIOSYNCRASY OF PLAINTIFF'S DECEDENT

### REQUESTED INSTRUCTION NO. ___

If you find that Patricia Kehm's illness and death was caused by an unusual susceptibility on her part to Toxic Shock Syndrome, then your verdict must be for Defendant[ ] on all claims asserted by Plaintiff[s] regardless of whether the use of Rely also contributed to her illness. That is, the law does not impose liability where injury results from an unusual physical condition not foreseeable by the manufacturer or seller and the product is safe for the vast majority of consumers.

The court refused to give this instruction because plaintiffs' evidence was that defendant knew or should have known of the possibility of women with Mrs. Kehm's "unusual physical condition" contracting TSS. In a failure to warn case such as this, evidence of knowledge on the part of the defendant of a peculiar susceptibility of a person to an allergic reaction, for example, entitles plaintiff to the submission of the issue of liability to the jury. *E.g. Basko v. Sterling Drug, Inc.*, 416 F.2d 417 (2nd Cir.1969) (manufacturer equally obli-

gated to warn in cases where drug may affect small number of "idiosyncratic or hypersensitive" users); *Davis v. Wyeth Laboratories, Inc.*, 399 F.2d 121 (9th Cir. 1968) (duty to warn exists even though chance of contracting polio only 1 in 1,000,-000); *accord, Reyes v. Wyeth Laboratories*, 498 F.2d 1264 (5th Cir.), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974); *Sterling Drug, Inc. v. Yarrow*, 408 F.2d 978 (8th Cir.1969); *Sterling Drug, Inc. v. Cornish*, 370 F.2d 82 (8th Cir. 1966).[16] Accordingly, the court correctly refused to instruct the jury regarding defendant's theory of "idiosyncratic reaction."

▮ Defendant also requested the court to submit the following instruction:

Evidence has been submitted showing that the Defendant[ ] withdrew Rely tampons from the market on September 22, 1980. You may only consider that evidence for a limited purpose. That evidence was submitted only for the purpose of background information for you. You should consider it only for that purpose, and for no other purpose. You may not consider this fact as evidence that Defendant[ ] [was] negligent. You may not consider this fact as evidence that the Rely tampon was defective, that the Defendant[ ] breached either implied or expressed warranties, or that there is a causal relationship between the usage of Rely tampons in menstruating women and the development of Toxic Shock Syndrome. As stated before, you may only consider this evidence as background information.

Defendant argues that FREv 407, which pertains to evidence of subsequent remedial measures, warranted the giving of this instruction. This contention is clearly without merit. *Farner v. Paccar, Inc.*, 562 F.2d 518, 528 (8th Cir.1977) (FREv 407 inapplicable in action based on strict liability in tort).

**C.**

▮ The last basis for a new trial concerns conduct by plaintiffs' counsel Tom Riley. Defendant levels a generalized charge that Mr. Riley continuously injected into the trial of this case argumentative and inflammatory comments for the sole purpose of appealing to the jury's passion and prejudice. Of the myriad of examples offered by defendant, the court deems it necessary to discuss only one.

On the evening of the sixth day of trial, Mr. Riley participated in a nationally broadcast television news program entitled "The Truth About Toxic Shock Syndrome." Through a telephone conversation with the program's moderator, Mr. Riley discussed the difference between this case and the *Lampshire* case in Colorado and he explained the basis for the ad damnum figure of $30,000,000 in this case. In the course of this conversation, Mr. Riley commented extensively on the evidence both in this case and in the *Lampshire* case. He also discussed the doctrine of punitive damages as it exists in Iowa and in Colorado; in this regard, he referred to the wealth of defendant.

The following morning, defendant, out of the presence of the jury, moved for a mistrial, citing as a basis Mr. Riley's involvement in the news program. After polling the jury and determining that no juror had seen the program or was aware of it, the court denied defendant's motion on the ground that no prejudice was shown. Defendant now argues that the court should have found prejudice *per se*, that is, that it was unnecessary even to poll the jury.

The two cases cited by defendant in support of this contention, *Reinstein v. Superior Court Dept. of the Trial Court of Mass.*, 661 F.2d 255 (1st Cir.1981), and *United States v. Williams*, 568 F.2d 464 (5th Cir.1978), are criminal law decisions; thus, they are distinguishable on that basis alone. Furthermore, they both involved publicity during trial that was far more

---

**16.** In support of its position, defendant cites *Bonowski v. Revlon, Inc.*, 251 Iowa 141, 100 N.W.2d 5 (1959). This case is distinguishable, however, on the ground that it was not a failure to warn case.

inherently prejudicial than the publicity involved here. Accordingly, the court rejects these cases.

The publicity in this case was not prejudicial to defendant. This is not to suggest that the court condones Mr. Riley's conduct, however. Indeed, as the court noted at the time defendant moved for a mistrial, Mr. Riley's involvement in the news program may very well deserve scrutiny by the appropriate ethics committee in Iowa.[17] The fact remains, however, that no juror was even aware of the news program. Therefore, no prejudice having been shown, a new trial is not required on this ground.

The court has considered all of defendant's arguments and is of the view that defendant's motion for a new trial must be denied.

### III.

Defendant has on file a motion to stay imposition of costs until the disposition of its motions for judgment notwithstanding the verdict and a new trial. This matter is moot now that the court has ruled on those motions.

### IV.

What remains is defendant's resistance to plaintiffs' bill of costs. Defendant objects to plaintiffs' bill of costs insofar as it seeks expert witness fees in excess of $30.00, travel expenses for out-of-town witnesses in excess of the reasonable cost of traveling 100 miles, various expenses associated with the taking of depositions, and subsistence charges for Dr. Tierno and Sue Myers in excess of the statutory per diem allowance. Although plaintiffs have not filed a response to this motion as required by Local Rule 2.2.6, the court believes that it can fairly rule on this matter at this time.

Defendant's first point is that plaintiffs are not entitled to expert witness fees in excess of the $30.00 attendance fee authorized by statute for each day of attendance and for the corresponding time spent traveling. 28 U.S.C. § 1821(b). The court agrees. Accordingly, plaintiffs are entitled to expert witness fees of only $420.00, not the amount of $13,850.00 sought by them.[18]

Defendant next invokes the 100 miles rule of 28 U.S.C. § 1821(c). There, it is provided that the prevailing party, to recover travel expenses for travel in excess of 100 miles, must provide a receipt or other evidence for the actual travel cost incurred. Plaintiffs, having failed to provide the appropriate documentation, are entitled to only $.20 per mile roundtrip, or $40.00 per witness.[19]

Next, defendant challenges plaintiffs' request for reimbursement of $5,710.83 in deposition costs. This matter is governed by 28 U.S.C. § 1920(2), which provides that fees may be recovered for all "necessary" depositions. This court, in construing the word "necessary," has always allowed the costs for depositions used in trial and for depositions of persons called as witnesses during trial. Furthermore, the court has always required the prevailing party to make a showing of what fees are properly recoverable. The court has examined the receipts attached to plaintiffs' bill of costs and determines to allow recovery of the fees for the depositions of Doctors Jacobs, Quetsch, Haas, Tierno, and Todd, Mr. Kehm and Mr. Widder, and Ms. Sterenchuk. These fees total $2,211.93.

Last, defendant challenges the subsistence charges submitted by plaintiffs

---

17. See Iowa Code of Professional Responsibility DR 7–107.

18. This figure was reached by multiplying $30.00 times the following number of days for each witness: Dr. Dan—3 days; Dr. Jacobs—2 days; Dr. Quetsch—1 day; Dr. Shirk—2 days; Dr. Tierno—2 days; Dr. Skopec—1 day; Dr. Chapman—2 days; and Dr. Helms—1 day.

19. The two witnesses involved here are Dr. Dan and Dr. Tierno. Rather than the total of $824.00 sought by plaintiffs for these witnesses' travel expense, the court awards only a total of $80.00.

for Dr. Tierno and Ms. Myers. 28 U.S.C. § 1821(d), which governs this matter, provides, in effect, for the recovery of a subsistence allowance not to exceed the maximum per diem allowance prescribed for official federal employee travel in the Cedar Rapids area, which is $50.00 per day.[20] Accordingly, plaintiffs are entitled to $100.00 in subsistence allowance for these witnesses, not the $399.72 they requested.

It is therefore

ORDERED

1. Defendant's motions for judgment notwithstanding the verdict and a new trial denied.

2. Defendant's motion to stay imposition of costs denied as moot.

3. Plaintiffs entitled to total costs of $3,475.87.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 80–F–1567

DELETHA DAWN LAMPSHIRE, by and through her next friend and father, KEITH THOMAS LAMPSHIRE, KEITH THOMAS LAMPSHIRE, individually, and DARLINE M. LAMPSHIRE, )

Plaintiffs, )

v. )

THE PROCTER & GAMBLE COMPANY, an Ohio corporation, THE PROCTER & GAMBLE DISTRIBUTING COMPANY, an Ohio corporation, THE PROCTER & GAMBLE PAPER PRODUCTS COMPANY, an Ohio corporation, )

Defendants. )

APPENDIX NO. 1

REPORTER'S TRANSCRIPT

Volume 10

Proceedings before the HONORABLE SHERMAN G. FINESILVER, U.S. District Judge, United States District Court for the District of Colorado, beginning at 1:30 o'clock p.m. on the 8th day of March, 1982, in Courtroom 201, United States Courthouse, Denver, Colorado.

DR. FRANK C. WOODSIDE, III, THOMAS S. CALDER and DEBORAH R. LYDON, Attorneys at Law, Dinsmore, Shohl, Coates & Deupree, 2100 Fountain Square Plaza, 511 Walnut Street, Cincinnati, Ohio, appearing on behalf of the Defendants.

APPEARANCES

JON F. KIDNEIGH and STEPHEN C. KAUFMAN, Attorneys at Law, Kidneigh, Hughes, Pelz, Leach & Clikeman, Suite 300, Colorado Club Building, 4155 East Jewell, Denver, Colorado, appearing on behalf of the Plaintiffs.

CARL F. EIBERGER, Attorney at Law, Eiberger, Stacy & Smith, 410 Seventeenth Street, Suite 2390, Denver, Colorado, and

PROCEEDINGS

THE COURT: Thank you. You may be seated, please. The record should reflect the presence of the attorneys of record. We are proceeding expressly outside the presence of the jury.

On January 15th, 1982, the defendants filed a motion in limine with supporting briefs seeking to have the Court exclude evidence of research conducted by the Cen-

---

**20.** Contrary to defendant's assertion, the current maximum subsistence allowance for travel to

Cedar Rapids, Iowa, is $50.00 per day, not $75.00 per day.

ter for Disease Control, the CDC, and several state health departments.

The Court ordered briefs on the points involved and the briefings have been rather extensive. The Court has proceeded with its own research, and I think that the gist of the motion in limine, or the preliminary motion by the defendants, is to exclude the studies or the summaries of the research and results as published in the CDC's *Morbidity and Mortality Weekly Report*, and in like publications of certain state health departments and in several medical journals.

The studies which the defendants seek to exclude have generally found tampon use to be significantly associated with Toxic Shock Syndrome, and in the majority of instances the studies have addressed the question by inference, anyway, of the association between defendants' Rely brand tampon and Toxic Shock Syndrome.

We are primarily dealing with the following exhibits: Exhibit 31, which is a CDC report from the *Morbidity and Mortality Weekly* broadcast or weekly report. Exhibit 32, which is CDC Study I published in the report on June 27th of 1980, and the *New England Journal of Medicine*, November 19th, 1980, and the Court very well, while the Court is delivering its bench ruling now, the Court reserves the right to edit and enlarge upon these remarks, insert citations where necessary, and the Court reserves the right after the record is transcribed and written up to prepare a written memorandum opinion if at that time the Court decides to do so.

Exhibit 32, which is the CDC Study No. II which was published in the *Morbidity Reports* of the CDC on September 29th, 1980. It will be published in the *Annals of Internal Medicine* in the spring of 1980. Exhibit 33 is the Utah-I study which was published in the *Morbidity Reports* of June 27th, 1980. Exhibit 34 is the Utah-II study. It was published by the MMWR on October 17th, 1980. *Communicable Disease Newsletter*, Utah State Health Department, 1981. *American Journal of Epidemiology* December 1981. Wisconsin study, Exhibit 32, to be published—it was published in the *New England Journal of Medicine* December 18th, 1980. The Tri-State Study, which embodies the states of Iowa, Wisconsin and Minnesota, Exhibit 35 and 36, these will be published in the *Journal of Infectious Diseases* in the spring of 1982. The Oregon study, which we will refer to only obliquely, is published in the *Communicable Disease Summary*, Oregon State Health Department, June 20th, 1981.

We conclude on a preliminary basis that these exhibits are relevant to a just determination of this case, and are admissible pursuant to noted Federal Rules of Evidence that we would outline.

We note initially the CDC study, and we are of the view that under a host of provisions of Federal Rules of Evidence, that these studies are admissible. We are of the view and find that generally significant CDC investigations or studies are officially reported on a timely basis to practitioners, academicians, researchers, health providers and the general public through these weekly publications designated generally in *Morbidity and Mortality Weekly Reports.*

Rule 803(8)(b) of the Federal Rules of Evidence admits reports of matters observed pursuant to a duty imposed by law as to which matter there was a duty to report.

The duty for the CDC to report significant investigations and studies relating to disease presentation and control is found in Section 301(a)(1) of the Public Health Service Act, 42 United States Code, Section 241(a)(1) wherein it is therein prescribed that this governmental agency shall conduct and promote the coordination of the research, investigations, experiments, demonstrations and studies relating to the causes, diagnoses, treatment, control and prevention of physical and mental diseases and impairments of man, and the secretary or his designees are authorized, one, to collect and make available for publications and other appropriate means information as to, and the practical application of such research and other activities, and, secondly, make available research facilities to the

appropriate public authorities, and to public health officials and scientists engaged in special study.

We are of the view clearly that the CDC reports are admissible under the several provisions that we will outline.

The Court has heard the testimony of Dr. Todd and also other doctors, and we are of the view that medicine has dramatically taught the public that the scientists, the researchers, investigators must often depend upon observations and calculations of many persons and techniques, and to deny scientists this opportunity to use these reports and studies would very much deny the scientists the opportunity to contribute knowledge and skills or problem-solving in health and other related fields.

The Court will not close the doors to the courthouse to the light which is given by studies and reports that we have outlined and which are generally considered and have been considered as authoritative and have been acted upon, and I dare say will continue to be acted upon by professionals, even if the results are not established with absolute certainty or scientific certainty.

And we underscore the proposition that the test of admissibility is not absolute certainty, but more especially the test of relevancy. And it goes without saying that under Rule 401, that we have the mark of relevancy clearly here.

One brick does not make a house. Many bricks make a house. One bit of evidence does not establish a case, but very well evidence individually and their totality establish and go toward establishing a result, or at least an inference of a result.

The tests that we have somewhat utilized have been as follows in determining the studies, and because we have a government publication, we would not solely state that this carries with it an imprimatur of regularity or imprimatur or authorization of infallibility. That is not necessary.

However, we are of the view that, and have considered some of these criteria: that the persons conducting this study were experts in the field. I dare say the

people with the CDC have that degree of expertise.

Dr. Osterholm from Minnesota has excellent qualifications, even though he is not an M.D. Dr. Davis from Wisconsin has been recognized in the testimony in this case. We are impressed with, as far as the background from a competency viewpoint, of Mr. Nichols from the State of Utah.

We are of the view that the persons conducting the respective studies did have experience and background and training in the fields involved. We also considered whether there was an adequate representative sample drawn from the proper universe of people to be studied. Was the interview and contact of the cases or the controls done in accordance with generally-accepted standards of objective procedures. We conclude yes.

Was there an effort to maximize neutrality and reliability responses. We conclude in the positive. The questions themselves generally asked were not misleading. They were not that difficult in nature.

Further, the data gathered was accurately reported in accordance with acceptable statistical procedures, and thus far we are of the view that even though there might be argument over the results, and we will comment on that in a minute, the methodology did follow accepted procedures.

We further recognize or consider the fact whether there was a motivation in the investigators for such a bias that would militate against the admissibility of the respective studies and reports. We can find no motivation other than to come out with some answers to a pressing health problem that was of national concern and marked in 1978 with seven subjects in Colorado, one of which who died, and of a national health concern of not only the entire population of the country, but particularly emphasis on the female population and individuals under 24 years of age who, by testing, we have found were primarily targets who were menstruating females.

This was the backdrop which started in 1978. We are of the view that the several

studies did not commence with any pre-judgment of what the results should be.

Now we have considered carefully the testimony of Dr. Todd, and Dr. Todd faulted these studies and said that No, he would not rely on it, but he did admit that the studies or the articles were such that professionals in the field would have relied upon them. Even though, "I don't think they should be relied," he also stated and testified that, "The reports would be utilized by researchers, by academicians and investigators or clinicians in the field."

It is significant also that to the query, to-wit with regard to the June 27th, 1980 MMWR report, "You as a pediatrician stated that you got the MMWR in the mail, and a 13 year-old menstruating girl came to you and she presented with signs of Toxic Shock Syndrome, signs and symptoms, she was wearing the tampon, would you advise her to remove that tampon based on what you read in the June 27th, 1980 MMWR," and he answered "Yes."

We are of the view that even though the study has been faulted in several regards, the reports of the MMWR of necessity had created an awareness of a major health concern of the country.

Emanating from the study in Denver by Dr. Todd that started with the seven people, what do we find in regard to the numbers? The CDC Study No. I involved 52 cases, 52 controls. The Wisconsin study had 35 cases, 150 controls. The CDC Study No. II—and these figures are subject to correction or verification—50 cases, 150 controls. The Utah study, September 1980, as I recall, was 24 cases, 71 controls. The Tri-State, 80 cases, 160 controls. And Oregon is 18 cases and 36 controls.

THE COURT: So, here, several years later, from mid-1978 to 1982, we have but seven studies that have all built upon the seven individuals that Dr. Todd started with in the development of a new malady, previously unknown, and somewhat mysterious, the ideology still somewhat confused, the genesis still being somewhat debated.

We are of the view that the respective studies will illuminate the testimony for the jury. It is clearly within Rule 401 that relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it will be without evidence.

We have considered, likewise, the criticism of the testimony or the study by Dr. Feinstein from Yale, but it is significant that Dr. Feinstein in the article that has been attached to his affidavits in this case recognizes the regularity of use of the retrospective case-control research technique, and I speak of his, Dr. Horowitz' and Dr. Feinstein's, article, which is referred to in several affidavits and appeared in the April, 1979 *Journal of Medicine* dealing with the methodology, standards and contradictory results in case-control research.

The first paragraph states that, "Retrospective case-control research has become a popular activity with widespread acceptance in the medical community. The general approval of this relatively new form of research has been aided by assurances from epidemiological authorities that case-control results are usually correct."

We recognize he has pointed out some biases. However, it appears from the testimony presented thus far that the only true research sample or model or protocol would be the use of tampons under carefully controlled conditions, and the results very well could be disastrous, so, of necessity, there has to be other techniques used.

There was necessity to go into these other research techniques. They are by approved methods. They have presented in an arguably realistic and authoritative way by professionals testimony that will be of assistance to the jury in better understanding the testimony and in determining the facts in this case.

We emphasize that there was a strong motivation for accuracy by the investigators. We could find that it has not been submitted there was any intentional bias, even though we have carefully considered the position of the defendants here that the

several studies do have a strong thread of bias throughout. However, we are of the view that this goes more to the weight to be considered than to the admissibility, and there is no true replication, there cannot be.

However, the Court has considered the evidence that there is the strong thread of association between tampon use and TSS in the several studies. I will leave it to the experts to explain this association between the use of tampons or Rely tampons and TSS. They are taken from different sources and different controls, and under what appears to be fairly realistic and well recognized surveillance systems in three states, a thread of consistency can be argued and urged, so we are not talking about one isolated study.

Now, we have considered the opinion of this Court in the swine flu litigation dealing with a gentleman by the name of L-i-n, 509 F.Supp. 8970, as clearly distinguished in that case, it was marked by a survey by a letter, sending a letter to hospitals and asking for information on Guillain-Barre.

We have also considered the Pittsburgh Press Club case as cited to the Court. This dealt with whether people felt they were being served properly at the restaurant operated by the Pittsburgh Press Club. That is not persuasive as far as this Court's concerned.

We are more probably persuaded by the Fifth Circuit case of *Braze v. Wyatt Laboratories*, 498 F.2d 1264, which dealt with the polio vaccine and the results to a youngster in Texas in a paralysis where the Fifth Circuit in a very extensive opinion stated, "The motivation for accuracy in a record prepared by Public Health officials in the outbreak of serious disease within the area committed to his charge is obvious. A grant of expertise sufficient to insure accuracy may be assumed. There can be no suggestion that in analyzing these cases officials were amateurish or careless."

And we have been somewhat persuaded by the rationale in that case. We are of the view that the noted exhibits are relevant to a just determination in this case,

pursuant to Rule 803-6, dealing with the federal shop book rule, 803-8, opinions of government agencies or findings, 803-24, residual hearsay exception.

To that extent, we direct counsel's attention to the case of *Brown v. United States*, a criminal case. The citation will be inserted.

We find that arguendo you cannot put these studies into a convenient cubicle as to an exception to the hearsay rule.

Under 803-24, we've got notice. We have a circumstantial guarantee of the trustworthiness. We have the aspect of necessity. There are only so many ways you could get this information, and that the evidence is more prohibitive of the point for which it is offered than other evidence which the proponents can procure through reasonable efforts.

We have considered the argument of the defendants that they have not been able to retrieve some of the raw data that went into the findings by the CDC. We recognize the fact that a case was filed in the United States District Court in Atlanta, and a request to have that case transferred here for adjudication. That apparently at this point has been denied, by the position taken by the CDC.

This, however, does not affect the admissibility of the respective studies or reports. That might be an argument. However, the agencies who are conducting these studies and reports under responsibilities invested with them by either Congress, as the case might be, or the state legislators, in effect would have been derelict had they not transmitted information on this national public health concern, albeit there might be some aspects of shortcomings in those reports.

The studies are also admissible not only as substantive evidence, if proper foundation is established as to the general authenticity. We are satisfied that at least thus far the authenticity, the requisites, have been established for the Utah study, generally for the CDC study, and if there are any other impediments to the other studies

that I have outlined, counsel may argue what they are.

However, clearly, the Court in this preliminary ruling, which has been carefully considered by the Court, we are of the view that not only may these reports and studies be admitted as substantive evidence, but also experts under Rule 703 or 704 of the Federal Rules of Evidence may utilize these reports, even though they were not admitted in evidence. The leading case on this point is the case from this circuit, *H & H Supply v. The United States*, the citation will be inserted, which deals, even though it is a condemnation case, it sets forth that an expert can base his opinion in whole or in part on hearsay testimony if it is of a type and technique that is generally utilized or relied upon by other experts in that field.

We have seen already in this case that life and death judgments have been made on the basis of hearsay, with the chemistry and other tests that were made of the plaintiff in this case. They are not made by the attending physician, but by support staff. That by its very nature is hearsay.

Further, if professionals in the field utilize hearsay if it is for life-saving responses, the Court is not going to close its eyes and say it is not going to give the jury the opportunity to do what people are doing in the field.

Researchers, doctors, academicians, of necessity, will review the seven studies and not blindly close their eyes to it, even though there are arguments that there are impediments in some regard. Under the circumstances, they are the best obtainable, and they have been faulted, but thus far we have heard nothing other than they have techniques recognized as proper techniques and utilized by researchers and scientists of the highest order thus far.

The investigations by the CDC and by the State Health Departments was in response to the need for information on a potential threat to the public health. They were conducted in the most accurate and scientific manner available at the time, and we find were, at least on this threshold question as to admissibility, sufficiently trustworthy factual findings to qualify for exception to the hearsay rule under the rules we have set forth, 803–6, 803–8 and 803–24.

In addition, we believe that although scientists may disagree about the efficacy of the methodology employed in these studies, the results obtained are the type of information on which experts in the field would reasonably rely, either as a starting point for further research or as a preliminary finding on the issue in question.

Thus, they are admissible. Arguendo, the witnesses qualified as expert under 703 and 704. The Court will not close the door on evidence which uses established methods and draws conclusions which are accepted by experts in the medical and scientific fields. The degree to which an expert recognizes the results of these studies without question or independent review goes to the weight of the evidence and not to the admissibility.

The evidence of the seven studies are prohibitive. To the contrary of the position urged on the Court by the defendants, these studies will not confuse the jury, but they will serve to illuminate and give meaning to other testimony in the case.

The defendants' motion regarding research conducted by the CDC and State Health Departments we intend to deny.

In similar regard, the Court is inclined to admit the FDA and CDC memorandum correspondence submitted by the defendants, again provided that a proper foundation as to authenticity and identification can be laid.

The fact that the plaintiffs disagree with the conclusion in these documents is not sufficient to warrant their exclusion.

The Court on a preliminary basis intends to admit Defendants' Exhibits Q, R, T, U, W, X, S, AA, AC, AE, AR, BB and BE.

In furtherance of the ruling here, the Court does intend to allow the testimony of Kyle Davis, and most particularly there might be several small areas that are ex-

cludable. However, defendants' motion to exclude the testimony of Kyle Davis filed on the 15th of January is denied.

The Court will take up the question of the admissibility of the complaints that were received by defendants concerning the Rely tampons, also the motion to exclude evidence of non-Toxic Shock Syndrome injuries, also other alleged tampon associated injuries, consumer complaints, at a later junction in the trial.

We have read these complaints and we state at this time there are only a limited number that we intend to allow to come in. A lot of those are so extraneous that under Rule 403 their prohibitive value will be substantially outweighed by the aspects of confusion or collateral issues.

So, counsel for the plaintiff, in your case you should anticipate there are only several that will be allowed in. That will affect also some of the depositions. Those that go to unrelated problems, the Court will not allow to come in, and most are in that category.

Mr. Kidneigh, Mr. Kaufman, you understand the Court's ruling in regard to these studies?

MR. KIDNEIGH: Yes, we do.

THE COURT: Mr. Eiberger?

MR. EIBERGER: We do.

THE COURT: Dr. Woodside?

MR. WOODSIDE: Yes, sir.

THE COURT: The record will so reflect.

We will be in recess for about five minutes, and let's proceed with Mr. Nichols.

(Whereupon, there was a recess then taken at 2:08 o'clock p.m. to be reconvened at 2:15 o'clock p.m.)